FILED

2003 NOV 12  P 4: 46


U.S. DISTRICT COURT
NEW HAVEN, CO...

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE JEEP WRANGLER CLASS ACTION | : | CIVIL NO. 3:02 CV 1219 (JBA) |
| | : | |
| ANGELA PHELAN, ADMINISTRATRIX OF | : | |
| THE ESTATE OF CHRISTOPHER PHELAN, | : | |
| CLASS MEMBER, AND INDIVIDUALLY | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| VS. | : | |
| | : | |
| DAIMLERCHRYSLER CORPORATION | : | NOVEMBER 12, 2003 |
| | : | |
| Defendant | : | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE EXPERT EVIDENCE AND TESTIMONY
AND MOTION FOR SUMMARY JUDGMENT**

Plaintiffs submit their Memorandum In Opposition To Defendant's Motion To Exclude

Expert Evidence And Testimony And Motion For Summary Judgment for the following reasons

and authorities.

**I.    BACKGROUND**

The Plaintiff estate of Christopher Phelan brings this product liability action for his

wrongful death, claiming that the roll cage system of Defendant's Jeep Wrangler (YJ) sports

1

**STANGER & ARNOLD, LLP**
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

utility vehicle is defective and caused Christopher Phelan's death in his Jeep Wrangler rollover accident.  Defendant filed a motion to exclude all evidence and testimony based upon computer simulations produced by Plaintiffs' experts Dr. Irving U. Ojalvo and Dr. Wilson C. Hayes, and any testimony by Dr. Ojalvo and Plaintiffs' expert Dr. Malka B. Shah on injury causation and the mechanism of injury that caused Chris Phelan's death.  Defendant also moved for summary judgment based on its motion to exclude.  Plaintiffs oppose Defendant's motion to exclude and its summary judgment motion because the expert testimony and evidence Defendant seeks to exclude is based on an adequate factual foundation and on reliable and relevant science, and Plaintiffs' experts are eminently qualified to testify as to their methodologies and opinions in this case.

## II.     FACTS

On January 18, 2000, Chris Phelan was traveling at about 57 mph in the westbound lane of Route 2 in Glastonbury, CT in his 1994 Jeep Wrangler (YJ) vehicle. Exh. 1, at 2, 9.  (Dr. Ojalvo's Jeep Rollover Fatality Accident Investigation & Design Evaluation Report – 1/03).  His Jeep Wrangler was struck from behind by a 1987 Ford Taurus that was traveling about 100 mph. Exh. 1, at 9.  As a result of the impact, the speed of the Jeep Wrangler was increased to about 80 mph. Id.

The impact thrust Phelan's Jeep Wrangler to the right and into a post and cable guardrail

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

system at a reduced speed of about 76 mph, due to vehicle swerving and braking. Exh. 1, at 2, 9. The Jeep Wrangler was caused to mount the guardrail and travel forward along the guardrail system, knocking down a light pole at a reduced speed of about 65 mph, due to vehicle breaking and collisions with the guardrail posts. Id. at 2, 9. Tire track markings and guardrail damages established the Jeep Wrangler continued to travel an additional 55 feet straddling the guardrail system, reducing the vehicle's speed to about 48 mph, where the Jeep Wrangler was caused to roll over to the right, down an embankment, and into a tree. Exh. 1, at 2-3, 5, 17, 21; Exh. 2, at 222 (Dr. Ojalvo's Deposition – 3/7/03).

The tripping mechanism that initiated the Jeep Wrangler rollover further reduced the vehicle's speed to about 40 mph prior to rolling over down the embankment. Exh. 1, at 9; Exh. 2, at 223-24. While airborne, the Jeep Wrangler rotated nearly 180°, and the A-Pillar area of the Jeep Wrangler roll cage system (where the upper left corner of the windshield frame meets the door frame) grazed the sloping embankment during the roll, crushing the A-Pillar area fatally into Chris Phelan's head. The Jeep Wrangler continued to rotate a total of about 270°, when the undercarriage of the vehicle came to rest against a tree. Exh. 1, at 2-3, 5, 17, 21, 23.

## III.    ADMISSIBILITY OF EXPERT EVIDENCE

The admissibility of expert opinion evidence is determined under Federal Rules of Evidence 702 and 703, and in accordance with the principles stated by the Supreme Court in

3

Daubert v. Merrell Pharmaceuticals, Inc., 509 U.S. 579 (1993).  "[T]he Supreme Court has made

clear that the district court has a 'gatekeeping' function under [Fed.R.Evid.] 702--it is charged

with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is

relevant to the task at hand.'" Savage v. Scripto-Tokai Corp., 266 F. Supp 2d 344, 347 (D.Conn.

2003 (Arterton, J.)) (quoting Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 265

(2d Cir.2002) (quoting Daubert, 509 U.S., at 597).  In fulfilling this critical role, the Court

considers the indicia of reliability set out in Rule 702, and "mak[ing] certain that an expert,

whether basing testimony upon professional studies or personal experience, employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." Savage, 266 F. Supp 2d, at 347 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526

U.S. 137, 152 (1999)).

    In determining if a party's expert opinion evidence will assist the trier of fact, the trial

court is to make a preliminary assessment of whether the reasoning or methodology underlying

the expert testimony is scientifically valid, and whether it can be applied to the facts in issue.

Daubert, 509 U.S., at 592-93.  In making this assessment, trial courts consider the following four

factors: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or

technique has been subjected to peer review and publication; (3) if it is a particular scientific

technique -- the known or potential rate of error, and the existence and maintenance of standards

4

controlling the technique's operation; and (4) whether there has been widespread acceptance within the relevant scientific community. Id. at 593-94. General acceptance of a theory, methodology or technique, however, is not required. Id. at 597.

## IV.    PLAINTIFFS' EXPERT EVIDENCE IS ADMISSIBLE

Defendant seeks to exclude all evidence and testimony based upon computer simulations produced by Dr. Ojalvo and Dr. Hayes using the Articulated Total Body (ATB) and the Graphical Articulated Total Body (GATB) computer software programs, and any testimony by Dr. Ojalvo and Dr. Shah on injury causation and the probable mechanism of injury that caused Chris Phelan's death. All of Plaintiffs' experts are eminently qualified to provide their expert opinions in this case. They have adequate factual foundations supporting their opinions. They all utilize reliable and relevant science to form and support their expert opinions. Most importantly, Plaintiffs' experts' accident reconstruction and opinions are consistent with the known facts of this accident.

Dr. Ojalvo conducted a rigorous investigation and accident reconstruction, and then used ATB to create a dynamic model of Chris Phelan's Jeep Wrangler and two computer-animated simulations that described and depicted the accident sequence and the Jeep Wrangler rollover. The ATB simulation also modeled the impact of the A-Pillar area of the Jeep Wrangler's roll cage with the embankment. ATB is a relevant and reliable science that passes Daubert's scrutiny, and

5

Dr. Ojalvo's ATB simulations are consistent with the known facts of this accident.

Dr. Hayes used GATB to study the motions and the forces to which Chris Phelan's body was subjected during the rollover event. GATB is an extension of ATB and is designed for use in the Human Vehicle Environment (HVE) software suite. Defendant seeks to exclude Dr. Hayes' GATB simulation on the sole ground that Dr. Hayes based his GATB simulation on Dr. Ojalvo's output data from his ATB simulations. However, as set forth below, Dr. Hayes independently reviewed, confirmed, and validated Dr. Ojalvo's ATB simulations, and conducted his own independent investigation to confirm and validate his GATB simulation. Although not challenged by Defendant in its motion to exclude, GATB, like ATB, also satisfies Daubert. In addition, like Dr. Ojalvo's ATB simulations, Dr. Hayes' GATB simulation is also consistent with the known facts of this case.

Both Dr. Ojalvo and Dr. Shah have extensive educational and professional backgrounds that make each of them qualified to testify on injury causation and the probable mechanism of injury of Chris Phelan's death. Furthermore, Dr. Ojalvo's rigorous accident investigation and Dr. Shah's autopsy of Chris Phelan provide an adequate factual foundation to support their expert testimony. Moreover, Dr. Ojalvo's and Dr. Shah's expert opinions on injury causation and the probable injury mechanism are consistent with each other and with the known facts of this accident.

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

A.    **Plaintiffs' Experts Are Qualified**

1.    **Dr. Ojalvo**

Dr. Ojalvo is a former Fulbright Scholar who holds a B.S. from the City College of New York, an M.S. from Massachusetts Institute of Technology, and a Sc.D. from New York University, all in Mechanical Engineering. Exh. 3 (CV – Dr. Ojalvo). He was the Bullard Professor of Mechanical Engineering at the University of Bridgeport for 7 years, and is a Licensed Professional Engineer in New York, Connecticut and Florida. Id. Dr. Ojalvo has also been elected a Fellow of the American Society of Mechanical Engineers for "outstanding contributions to the field". Id.

Dr. Ojalvo has authored over 90 technical journals for leading national and international engineering journals, and has conducted several hundred vehicle accident reconstructions over the past 20 years, in addition to a large number of investigations and analyses involving a wide variety of other causes of personal injury. Id.; Exh. 4, at 5g. (Dr. Ojalvo Affidavit). Dr. Ojalvo has also testified as a mechanical and biomechanical expert in a number of different jurisdictions[1], and has lectured at the Police Academy in Meriden, CT on accident reconstruction and injury causation. Exh. 4, at 5g. As a consultant to both the United States Government and

---

[1] O. Aviles & L. E. Aviles v. I. M. Berger & NJ Transit Bus Operations, et al., NJ Superior Court, Essex County, Docket No. ESX-L-7994-00; C. J. Franzetti, et al v. R. S. Dombrowski, CT Superior Court, J. D. of Stamford/Norwalk, D.N.CV 99 0175281 S; Montano & G. Garcia v. City of NY & NYC Housing Authority, Supreme Court of the State of NY, County of NY Index No. 125518/93.

7

**STANGER & ARNOLD, LLP**
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

NASA, Dr. Ojalvo has developed a state-of-the-art structural dynamics computer program, and lectured to NASA engineers.  Exh. 3.

### 2.    Dr. Hayes

Dr. Hayes is currently Professor of Exercise and Sport Science and Adjunct Professor of Mechanical Engineering at Oregon State University.  Exh. 5 (CV – Dr. Hayes); Exh. 6 (Hayes Report – 1/31/03).  He holds both a B.S. and an M.S. in Mechanical Engineering from Stanford University, and a Ph.D. in Biomedical Engineering from Northwestern University, where his course of study involved both medical school and engineering courses.  Id.

Prior to teaching at Oregon State University, Dr Hayes was an Assistant Professor of Mechanical Engineering and Surgery (Orthopaedics) at Stanford University, where he developed a testing facility for the study of human tolerance limits to motor vehicle impacts.  Id.  After leaving Stanford University, Dr. Hayes served as the Director of the Orthopaedic Biomechanics Laboratory at Boston's Beth Israel Hospital, and Associate Professor of Orthopaedic Surgery at Harvard Medical School and at the Harvard MIT Division of Health Sciences and Technology. Id.  While at Harvard Medical School, Dr. Hayes was named a Full Professor, and held Harvard Medical School's first Maurice E. Mueller Professorship of Biomechanics.  Id.

Dr. Hayes has more than 30 years of teaching, research and consulting experience in fields ranging across mechanical engineering, accident reconstruction, occupant dynamics, injury

8

biomechanics, human functional anatomy, and clinical orthopaedics. Exh. 5; Exh. 6. He has taught undergraduate, graduate, and post-graduate students in both engineering and medical school settings and has lectured in a wide variety of post-graduate courses for engineers, medical students and residents, and clinical orthopaedists. Id. More recently, he has been lecturing on injury biomechanics to accident reconstructionists and forensic scientists. Id. Dr. Hayes has served as Principal or Co-Principal Investigator on over 60 research grants from federal, foundation or industrial sources, all of them involving the biomechanics of the musculoskeletal system. Id. Several of these grants have directly involved the injury biomechanics of motor vehicle accidents and his research results are cited by scientists and experts in the field. Id. Dr. Hayes has also authored or co-authored more than 185 peer-reviewed publications, over 60 chapters, and three books. Id.

### 3.    Dr. Shah

Dr. Shah was the Associate Medical Examiner for the State of Connecticut who performed the autopsy on Christopher Phelan's body. Exh. 7 (CV – Dr. Shah); Exh. 8 (Christopher Phelan's Postmortem Report – 1/19/00). Dr. Shah holds an M.B.B.S. from the University of Bombay, India, and an E.C.F.M.G. Certificate. Dr. Shah has been American Board of Pathology eligible since 1977, and Forensic Pathology eligible since 1984. Exh. 7. She has also served as a Clinical Instructor since 1982. Id.

9

For over 22 years, Dr. Shah has worked as an Associate Medical Examiner for the State of Connecticut. Exh. 7. As an Associate Medical Examiner, Dr. Shah evaluates all sudden unexpected deaths reported to the Office of the Chief Medical Examiner, and she has performed over 5,000 autopsies to determine the cause and manner of violent deaths, including countless autopsies where death resulted from massive head trauma sustained in an automobile accident. Id.; Exh. 9, at 25-26 (Dr. Shah's Deposition – 3/24/03). In addition to her duties as an Associate Medical Examiner, Dr. Shah also gives seminars and teaches courses on forensic pathology to physicians, pathologists, law enforcement officers, and paramedical professionals, with an emphasis on investigating traumas from the medical examiner's point of view. Exh. 7; Exh. 9, at 24-25.

**B.      Plaintiffs' Expert Opinions Are Reliable And Relevant**

     **1.      Dr. Ojalvo**

         **a.      Dr. Ojalvo's Investigation, Accident Reconstruction, And ATB Simulations Accurately Replicate The Known Facts Of The Accident**

            **i.      Investigation**

Dr. Ojalvo began his accident investigation by reviewing the police accident report, photographs of the vehicle and accident scene, and the depositions of the police officers, medical providers and personnel, and witnesses. Exh. 1, at 4. Dr. Ojalvo then inspected the Phelan

10

vehicle on two occasions, where he took photographs and measurements of the vehicle damage, and of the driver's seat, with and without a surrogate seated in the driver's seat. Exh. 1, at 4. He also visited the accident site and took photographs and measurements to prepare a scale diagram of the accident scene. Id. While at the accident site, Dr. Ojalvo determined the approximate location of the initial impact and identified the incident tree against which Chris Phelan's Jeep Wrangler came to rest, as well as where the Taurus came to rest. Id. He also identified the accident light post base with the light pole that had been replaced, and the positions of the guardrail posts that had been damaged during the accident. Id.

Dr. Ojalvo analyzed are distance from initiation of roll to incident tree, distance from initiation of roll to initial windshield impact, distance from guardrail to initial windshield impact, linear Jeep speed at departure from guardrail, rotational Jeep speed (roll) at departure from guardrail, tire-hill coefficient of friction, Jeep windshield-ground average impact force, Jeep windshield-ground deflection, and linear speed at tree impact. Id. at 14.

### ii.    Accident Reconstruction

Dr. Ojavlo next created a scale drawing of the accident scene that indicated the approximate point of impact, resting places of the vehicles, and post impact vehicle path. Id. at 5. The initial rear-end impact of the Jeep resulted in front end damage to the Ford and rear end damage to the Jeep. Id. at 18-20. To account for this damage, Dr. Ojalvo created a scale drawing

11

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

of the magnitude and shape of the crush damage seen on the Jeep Wrangler, and estimated the impact crush damage to the Ford from photographs. Exh. 1, at 18-20. The damage to the Jeep Wrangler was measured and the impact force to the Jeep Wrangler was correlated (action and reaction – Newton's third Law) with that on the Taurus due to the same impact. Id. at Figure 18.

Using energy conservation calculations and resting places of the vehicles, Dr. Ojalvo was able to work backwards to determine the pre and post impact speeds of each of the vehicles using standard conservation of momentum and energy principles of accident reconstruction. Id. at 5. This established the speed at which the Jeep Wrangler struck the guardrail system, and the speed at which the Jeep Wrangler was caused to separate from the guardrail, and roll down the embankment. Id. From his reconstruction, Dr. Ojalvo was able to determine the average angular velocity necessary to complete the Jeep Wrangler's 270° roll before striking the tree that terminated the vehicle's motion. Id. He then computed the plastic hinge moment of the roll cage based on standard elastic/plastic beam analyses for the roll bar members and the windshield support structure. Id.

As part of Dr. Ojalvo's accident reconstruction, he obtained exemplar roll bar and windshield support structures for the 1994 Jeep Wrangler and tested these to experimentally verify their plastic hinge (crush) properties. Id. at 6. The 2 ½" O.D. roll bar was cut into test specimens, and were placed in a DP25-S text fixture at Stanford Testing of Stamford, CT, with a

12

transverse load applied to a load cell at the center of the samples. Exh. 1, at 6. This helped

establish the moments required to generate plastic hinges in the Jeep Wrangler's hollow roll-cage

sections. Id. The process was repeated for two specimens taken from the windshield support

structure. Id. The simple supports for all these specimens were 20" apart. Id. Bending for the

windshield support structure was induced about the horizontal axis of the top member, since this

was the primary bending direction of the incident Jeep. Id.

### iii.   ATB Simulations

Dr. Ojalvo next inputted the known facts he determined during his investigation and the

additional accident reconstruction into the ATB software program to create a dynamic model of

the Jeep Wrangler, and a simulation that depicted the accident sequence and the Jeep Wrangler's

roll down the embankment. Id. at 5. Dr Ojalvo also used the ATB software to simulate the

dynamic motion of the biomechanical model for the seat-belted Chris Phelan to identify the

source of his fatal injury. Id. at 20.

Two-dimensional energy and momentum conservation principles, in combination with the

evidence (vehicle damage and skid marks) were sufficient to understand all of the Jeep

Wrangler's motions prior to initial contact with the guardrail. Id. at Appendix 1. Since this

motion was already understood and could be reasonably addressed by conventional and well-

accepted two-dimensional reconstruction procedure, it was not necessary to simulate this phase

13

using ATB. Exh. 4, at 5a. Instead, Dr. Ojalvo's first ATB simulation started at the instant just after the Jeep Wrangler mounted the guardrail using the known and reconstructed facts. Id. The position and orientation of the Jeep following initial guardrail mounting was based on the straight-line guardrail and light post damage as well as roadway and vehicle damage. Id.

Dr. Ojalvo did not model the impact of the Jeep Wrangler on the cables of the guardrail system, because guardrail cables cannot transmit compressive forces. Id. at 5b. There was no evidence that the cables snared any component of the Jeep Wrangler or provided significant tensile forces to slow the vehicle down. Id. at . The guardrail cables are attached to the posts with metal hooks that failed during the accident, causing the cables to lye partially on the ground as shown in the police accident scene photos. Id. Once disconnected from their attachment points with the guardrail posts, the cables produce negligible longitudinal forces on the Jeep, because they offer no resistance in compression. Id.

The initial impact by the Taurus deformed the Jeep Wrangler's rear driver's side sheet metal and C-Pillar. Exh. 1 at Figures 18-20. This rear end damage did not significantly affect the roadway and light post contact points on the Jeep (i.e. tires or front bumper). Id. at 5c. Dr. Ojalvo's reconstruction revealed that this portion of the vehicle did not interact with any objects (ground, guardrail, tree) during the remainder of the accident, therefore, the geometry of the rear portion of the vehicle was not relevant to Dr. Ojalvo's ATB simulation. Exh. 4, at 5c.

14

The location evidence of the last guardrail damage indicated where the Jeep left contact with the guardrail system. Id. at 5e. Conservation of momentum considerations and ATB computer simulations showed that the Jeep Wrangler's rollover must have been initiated in the area where the last guardrail damage occurred. Id. In addition, ATB parametric study of the accident rollover in any other vehicle position and orientation produced results that did not agree with the known facts of this case. Id. Based on the Jeep Wrangler's rest position, Dr. Ojalvo's second ATB simulates the Jeep Wrangler's linear velocity and rotational speed as it began to roll from the guardrail area down the embankment. Exh. 1, at 5-6. The simulation also modeled the impact of the Jeep Wrangler's roll cage with the ground. Id. at 6. The plastic crush energy absorbed in deforming the incident roll cage structure helped establish the roll cage/ground contact parameters used in the ATB simulation. Id.

Following the ATB simulations, Dr. Ojalvo created a finite element model (FEM) of the roll cage and determined the internal bending moment experienced by the A-Pillar windshield support area (damaged section) during the rollover. Id. The forces obtained from the ATB simulation determined the actual load applied to the damaged part of the windshield support structure in the finite element model. Id.

Based on the observed damage to the Jeep Wrangler, and its orientation to the embankment at the time of the grazing A-Pillar impact with the embankment, the impact force

15

only produced a small amount of forwards or backwards forces on the windshield frame. Exh. 1, at Figures 9 & 11. Based on the lack of front-to-back deformation to the B-pillar of the driver's side roll cage structure, it was clear that the grazing rollover impact with the embankment was not severe enough to deform the B-Pillar and windshield in the front-to-back direction (though it was deformed laterally as a result of the normal load component). Exh. 4, at 5f. This impact force is consistent with the observed damage. Id.

### b. ATB and GATB Are Reliable And Relevant Science

Both ATB and GATB are reliable and relevant scientific techniques, and these computer simulation programs satisfy all four factors considered by the Supreme Court in Daubert.

### i. ATB and GATB Can Be Tested

Dr. Ojalvo's ATB simulations satisfy the first Daubert factor because they can be tested. Martin v. Shell Oil Company, 180 F.Supp.2d 313, 319 (D.Conn 2002) ("The Daubert factors and scientific methodology require that an opinion be testable, not that it necessarily be tested."). Daubert requires only that an expert's scientific theory or technique can be tested, not that it has been tested. Daubert, 509 U.S., at 593 (emphasis added). Moreover, the ATB software is publicly available and the laws of physics and equations underlying this science are commonly understood. Livingston v. Isuzu Motors, Ltd., 910 F.Supp. 1473, 1495 (D.Mont. 1995).

Dr. Ojalvo provided Defendant with the data he used to create his ATB simulations at his

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

deposition on November 25, 2002. <u>Exh.</u> 10, at 84-86 (Ojalvo Dep. - 11/25/02). Defendant's

accident reconstruction expert, Mr. Bailo, has had access to the ATB software and Dr. Ojalvo's

input data, and Mr. Bailo has the ability to test Dr. Ojalvo's simulations. <u>Exh.</u> 11, at 122-23

(Bailo Dep). Mr. Bailo even started to test Dr. Ojalvo's ATB simulations. However, either Mr.

Bailo chose not to, or Defendant instructed him not to, complete his testing:

> **Q:** Did you utilize your ATB software in regard to critiquing Dr. Ojalvo's
> opinions?
> **A:** I started to. And I guess I would qualify that as I'm not – I couldn't get
> very far.
> **Q:** Was there a reason?
> **A:** Lack of time. <u>Id.</u>

The availability of ATB software, and Dr. Ojalvo's input data for his ATB simulations, permits

Defendant a full and fair opportunity to examine and test ATB software, and Dr. Ojalvo's input

and output data. <u>Perma Research & Development v. Singer Company</u>, 542 F.2d 111, 125 (Van

Graafeiland dissenting)(2d Cir. 1976)(citing <u>United States v. Dioguardi</u>, 428 F.2d 1033, 1038 (2d

Cir.), <u>cert. denied</u>, 400 U.S. 825 (1970); <u>United States v. Russo</u>, 480 F.2d 1228,1241 (1973).

> **ii.    ATB and GATB Have Been Subjected To
> Publication And Peer Review**

ATB and GATB also satisfy <u>Daubert's</u> second factor because they have been subjected to

publication and peer review. The Society of Automotive Engineers has published 79 articles

relating to ATB simulations. <u>Exh.</u> 12 (SAE search results). Moreover, the use of ATB and GATB

17

to simulate rollover events, specifically to simulate gross vehicle motion, assist with accident reconstruction, and model occupant kinematics, has been validated in numerous peer-reviewed, scientific studies and experiments.

In 1986 scientists validated ATB to simulate gross vehicle motion and body motion in a rollover. Exh. 13 (Johnson, A., Kaleps, I., Obergefell, L., Simulation of Restrained Occupant Dynamics During Vehicle Rollover, Department of Transportation, National Highway Traffic Safety Administration Final Report No. DOT HS 807 049, June 1986). The report validated ATB's ability to accurately simulate rollover accidents by comparing ATB simulation results to a controlled rollover where sensors monitored the subject vehicle and its motion was videotaped. Id. at 2.

The report found that "[t]his reconstruction can serve not only to validate the modeling methodology, but can also be used as the basis or benchmark for predictive simulation of situations similar in nature." Id. at 1. The report also concluded that "the reconstructed motion agrees well with the observed motion with some minor phase differences." Id. at 14. Furthermore, "[t]he simulation was successfully performed and in the process the capability and applicability of the ATB model for crash/rollover event simulation was demonstrated." Id. at 39. The report also noted that "[t]he lap belt is the main constraint in keeping the body in its seat, it is almost always in tension," and "forces that occur when a contact between the body and the

18

vehicle takes place, are another output of the ATB model. Id. at 36. The report further concluded that "[t]he simulated dummy kinematics agreed very well with the observed response considering the complexity of the vehicle motion, the duration of the event and the first order approximations used describing the dummy and vehicle interactions.

The 1986 report was further validated in 1989 based on additional testing using the results of two controlled automobile rollover crash tests. Exh. 14 (Kaleps, I., Obergefell, L., Rizer, A., Simulations of Vehicle Dynamics During Rollover, Department of Transportation, National Highway Traffic Safety Administration Final Report No. DOT HS 807 587, May 1989). The report concluded, "The results of these two vehicle rollover simulations clearly demonstrate the feasibility of using the ATB model as a predictive simulator for gross vehicle motion for a crash/rollover event." Id. at pp. 1, 64.

In 1993, researchers again validated ATB's capability "to predictively simulate occupant dynamics in vehicle rollover crashes . . . using the results of two controlled automobile rollover crash tests." Exh. 15 (Obergefell, L., Rizer, A., Smith, J., Predictive Simulation of Restrained Occupant Dynamics in Vehicle Rollovers, Society of Automotive Engineers, No. 930887, 1993, at 5.). The report noted, "[b]y first validating the computer simulation methods against full-scale testing results, predictive simulations can be used in studying occupant dynamics during rollover." Id. at 5. In addition, the report found that "[a]t the time of impact … the roof crushed

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

downward in a wavelike motion from right to left as the vehicle rolled across its roof, pushing the occupant's head downward and flexing the neck until the left side of the head touched the shoulder, eventually submarining the occupant." Id. at 9.  The report further concluded, "The objective of this effort was to validate the use of the ATB model to predictively calculate the occupant dynamics during a rollover crash.  The results of the validation simulation demonstrate that with properly developed input parameters the occupant dynamics can be reasonably predicted, as demonstrated in the film and simulation pictures" Id. at 12.

A 1995 study further demonstrated "the ATB model can be used to provide a reasonable prediction of the vehicle's motion during a rollover accident using the data available in [a] NASS [accident] report." Exh. 16 (Cheng, H., Obergefell, L., Rizer, A., Pickup Truck Rollover Accident Reconstruction Using the ATB Model, Society of Automotive Engineers, No. 950133, 1995, p. 11.)  In this study the researchers used an accident report to validate simulation results, concluding, "The vehicle simulation performed in this study successfully reconstructed the vehicle's motion for the entire accident," and "[t]he comparison shows that the ATB model matches very well with the limited accident investigation data available.  The study demonstrates that the ATB model is an effective tool for the accident study." Id. at 12, 14, 17.

A parallel study conducted simulations showing "the ATB model predicts the major features of the occupants' motion." Exh. 17 (Cheng, H., Obergefell, L., Rizer, A., ATB Model

20

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042