Simulation of a Rollover Accident with Occupant Ejection, Society of Automotive Engineers, No. 950134, 1995, p. 30.)  The study noted, "The NASS report stated that both the driver and the passenger wore seat belts when the accident occurred and there was no belt failure.  The driver was seemingly well protected by the belt system ... and the driver suffered abrasions and contusions on the left side of the head and face." Id. at 23.  "In addition, Figure 3 shows that a contact occurred between the head and left window glazing due to the yawing of the vehicle." Id. at 25-7.  This study is consistent with Plaintiffs' experts' opinions in this case.

GATB has also been validated through its comparison with ATB.  Exh.18 (Grimes, W., Using ATB Under the HVE Environment, Society of Automotive Engineers, No. 970967, 1997, p. 395.)  Grimes concluded, "The ATB (Articulated Total Body) computer model has been used in the collision reconstruction field for many years," and GATB "allows the user to set up, edit and run the ATB model in a graphical environment." Id. at 395-96.  Grimes further noted, "The ATB program has previously been validated so it is used as the basis of comparison," and GATB "was found to be completely compatible with the standard version of ATB." Id. at 401-03.

            iii.     **ATB And GATB Have A Known Potential Rate Of Error, And The Accuracy Of Dr. Ojalvo's Simulations Has Been Verified**

Dr. Ojalvo's ATB simulations also satisfy Daubert's third factor because the potential rate of error has been well documented in the ATB and GATB validation studies discussed above, and

21

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

because Dr. Ojalvo's methodology utilized standards to verify that his simulations were consistent with the known facts of this accident.

A selection process of critical information is always required in any engineering analysis and, in this sense, all such analyses may be considered "subjective." Exh. 2, at 208-09; Exh. 4, at 5g. Only when this process does not reveal all critical elements, then initial assumptions are analyzed and refined. Id. The art of engineering is to make reasonable assumptions while not eliminating critical elements. Id.

Dr. Ojalvo conducted a rigorous investigation and accident reconstruction to determine the factual inputs for his ATB simulations. Exh. 1. Dr. Ojalvo further confirmed that his ATB simulations were accurate through a process of altering the data input parameters to analyze their effect on the results. Exh. 2, at 223. Dr. Ojalvo was able to confirm that his accident reconstruction and ATB simulations were accurate by altering input parameters, such as vehicle speed, vehicle damage, trip point, etc., causing the simulation to deviate from the physical evidence and known facts of this case. Exh. 1; Exh. 2, at 223. The analysis and alteration of this data confirms that Dr. Ojalvo's ATB simulations are consistent with the known facts of this case, thereby eliminating incorrect possibilities and scenarios. Exh. 4, at 5e.

Defendant criticizes Dr. Ojalvo's ATB simulations because they claim that he did not model certain changes to the body of the vehicle that allegedly resulted from the initial impact.

22

Exh. 4, at 5d. These changes were not modeled because the geometry of the rear portion of the Jeep body would not have any effect on the simulation results, unless the left rear portion of the vehicle contacted the ground or any other objects in the accident sequence. Id. Because such contacts were not observed on the vehicle or in the simulation, the addition of such details would have no effect on the simulation results. Exh. 2, at 208.

### iv.    ATB and GATB Are Widely Accepted Within The Relevant Scientific Community

ATB and GATB also meet Daubert's fourth factor because they are widely accepted within the relevant scientific community for the purposes used by Dr. Ojalvo and Dr. Hayes. ATB was developed "under joint sponsorship of the Motor Vehicles Manufacturers Association and the National Highway Traffic Safety Administration." Exh. 19 (Digges, K., Recent Improvements in Occupant Crash Simulation Capabilities of the CVS/ATB Model, Society of Automotive Engineers, No. 880655, 1988, p.1). Early in its development, General Motors not only used, but also allowed improvements that it identified for ATB to be incorporated into the source code. Id. at 3. Austin Rover permitted the same. Id. at 3. More recently, Honda R&D, North America used ATB. Exh. 20 (Tanahashi, M., et al., A New CVS/ATB Hybrid III Model for Lower Extremity Studies: Development and Validation, Society of Automotive Engineers, No. 980357, 1998).

Clearly, ATB and GATB are widely accepted within the relevant scientific community to

23

simulate vehicle rollovers, roof crush and occupant kinematics/dynamics. Articles validating ATB and GATB simulation of roll over crashes, roof crush and occupant kinematics/dynamics also demonstrate their acceptance within the relevant scientific community. Livingston v. Isuzu Motors, Ltd., 910 F.Supp. 1473, 1495 (D.Mont. Dec. 22, 1995). In addition, ATB and GATB also apply commonly accepted scientific principles of Euler equations of motion with Lagrange type constraints capable of solving three-dimensional equations of motion, modeling configurations of vehicles, and describing the dynamic environment that Defendant does not challenge. Exh. 16 (Cheng, H, Rizer, L., Obergefell, L., Pickup Truck Rollover Accident Reconstruction Using the ATB Model, 950133, 13).

    c. **Dr. Ojalvo's ATB Simulations Are Consistent With The Facts Of The Accident And His Accident Reconstruction**

Dr. Ojalvo's ATB simulations are consistent with the facts he determined during the course of his rigorous accident investigation and accident reconstruction. Daubert does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is the only means by which it could have occurred. It Daubert only requires that the proponent of the evidence show that the expert's conclusions have been arrived at in a scientifically sound and methodologically reliable fashion. U.S. v. Mooney, 315 F.3d 54, 63 (1st Cir. 2002); Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). "Vigorous cross-examination, presentation of contrary evidence, and careful

24

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S., at 596. These issues of fact must be left to a jury to decide so long as there is "a scintilla of evidence presented supporting a position" that is sufficient to allow a reasonable juror to conclude that the position is more likely than not true. Id.

### d. Dr. Ojalvo Is Qualified To Testify On Injury Causation

Dr. Ojalvo's testimony on injury causation is drawn from his extensive education and practical experience. Dr. Ojalvo has conducted several hundred vehicle accident reconstructions over the past 20 years, in addition to a large number of investigations and analyses involving a wide variety of other causes of personal injury. Exh. 3; Exh. 4, at 5g. Dr. Ojalvo has testified as a biomechanical expert in a number of different jurisdictions, and has lectured at the Police Academy on accident reconstruction and injury causation. Exh. 4, at ; See O. Aviles & L. E. Aviles v. I. M. Berger & NJ Transit Bus Operations, et al., NJ Superior Court, Essex County, Docket No. ESX-L-7994-00; C. J. Franzetti, et al v. R. S. Dombrowski, CT Superior Court, J.D. of Stamford/Norwalk, Docket Number CV 99 0175281 S; Montano & G. Garcia v. City of NY & NYC Housing Authority, Supreme Court of the State of NY, County of NY Index No. 125518/93.

### e. Dr. Ojalvo's Proposed Injury Causation Testimony Is Based On An Adequate Factual Foundation

Dr. Ojalvo's injury causation testimony is based upon his rigorous accident investigation

25

and accident reconstruction, which involved two separate inspections of the vehicle and a review of Chris Phelan's autopsy and medical reports, and Dr. Ojalvo's ATB simulations. Exh. 1. As part of Dr. Ojalvo's investigation, he correlated the orientation of Chris Phelan's fatal head injury, a 13-inch fracture emanating down his left temple, with the location and shape of the accident-deformed driver's side A-Pillar. Exh. 21, at 56-58 (Dr. Ojalvo's Deposition – 12/2/02). Dr. Ojalvo also climbed into the driver's seat of the incident vehicle, compensated for the bent seatback by maintaining his back erect (in spite of the damaged driver's seatback), and moved his head forward and slightly to the left further establishing the close match up of the area of his head and Chris Phelan's head injury location. Id. Dr. Ojalvo's 5'-8" seated head height is 1 inch higher than the Chris Phelan's 5'-7" seated head height. Exh. 1 at Figures 7, 11. Based on Dr. Ojalvo's investigation and accident reconstruction, his ATB simulations, and his review of Chris Phelan' autopsy report and medical records, he reached the expert opinion that Chris Phelan's fatal head injury was caused by his Jeep Wrangler's driver's side A-Pillar crushing downward into his head at the point of the grazing impact on the enbankment.

### 2.    Dr. Hayes

Defendant has moved to exclude Dr. Hayes' GATB simulation and related testimony because his GATB simulation is based on Dr. Ojalvo's ATB simulations. As set forth above, GATB, like ATB, is a science that passes scrutiny under Daubert. Moreover, Dr. Ojalvo's ATB

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

simulations are based on his rigorous investigation and accident reconstruction, and accurately depict the facts of this case. As such, Dr. Hayes' GATB simulation is relevant and reliable, and is based on an adequate factual foundation.

Dr. Hayes' expert testimony is not based on a "wholesale adoption" of Dr. Ojalvo's of ATB simulations and conclusions. While Dr. Hayes did use data from Dr. Ojalvo's ATB rollover simulations as input to his GATB occupant dynamics simulation, Dr. Hayes did not accept this data blindly nor was the data the complete foundation for his opinions. Dr. Hayes made every reasonable effort to independently validate Dr. Ojalvo's analysis. Exh. 22, at 5a (Dr. Hayes Affidavit) Moreover, the occupant dynamics simulation that Dr. Hayes presented and subsequently used as the basis for his opinions was independent of any occupant dynamics simulation presented by Dr. Ojalvo. Id. Dr. Hayes simulation was performed with the GATB occupant dynamics model. The GATB Model is used to evaluate the three-dimensional dynamic response of the human body when subjected to an environment consisting of high-speed inertial and contact forces. Id. at 5c. The software is used to compute occupant kinematics (position, velocity, and acceleration vs. time), joint angles and torques, and contact forces between the human occupant and contact panels attached to the interior of the vehicle. Id.

In addition, Dr. Hayes reviewed the Ojalvo report in its entirety, and reviewed Dr. Ojalvo's ATB input data files. Exh. 22, at 5b. The contents of these documents/files were then

27

compared with, among other materials, the State of Connecticut Police Report, including the investigation officer's description of the scene, scene photographs, measurements of the scene, scale diagram of the scene, description of vehicle damage, vehicle photographs, vehicle schematics, witness statements, depositions, medical reports, and Chris Phelan's autopsy report and photographs. Id. at 5b.

### 3. Dr. Shah

Defendant has moved to exclude Dr. Shah's testimony on injury causation, and the probable injury mechanism that caused Chris Phelan's death, on the grounds that she lacks the necessary qualifications and factual foundation for her expert testimony. Dr. Shah's 22+ years as an Associate Medical Examiner for the State of Connecticut, her medical specialty as a forensic pathologist, and her experience in performing over 5,000 autopsies, make her eminently qualified to testify on injury causation and the probable injury mechanism in this case. In addition, Dr. Shah's personal observations, data, and medical opinions formed from her autopsy provide an adequate factual background to support her testimony.

### a. Dr. Shah's Is Qualified To Testify On Injury Causation And The Probable Mechanism of Injury

Defendant claims that Dr. Shah lacks the necessary qualifications to testify on injury causation and the proposed injury mechanism because "she has no education in mechanical engineering, no background or other source of expertise in biomechanics of automobile accidents,

28

and no experience in the design of automobiles or automobile components – including the vehicle's doorframe – and no training in how to determine if a vehicle occupant was wearing a restraint." Curiously, Defendant completely ignores Dr. Shah's medical and educational background, including her 22+ years as an Associate Medical Examiner for the State of Connecticut where, among other duties, she performed over 5,000 autopsies to determine the cause and manner of violent deaths, including countless autopsies where death resulted from massive head trauma sustained in an automobile accident. Exh. 7; Exh. 9, at 25-26.    In addition, Defendant fails to acknowledge that Dr. Shah is a forensic pathologist who has given seminars and taught courses on forensic pathology to physicians, pathologists, law enforcement officers, and paramedical professionals, with an emphasis on investigating traumas from the medical examiner's point of view. Exh. 7; Exh. 9, at 24-25. As such, Dr. Shah is more than qualified to testify on injury causation and the probable injury mechanism in this case.

      **b.    Dr. Shah Has An Adequate Factual Foundation To Testify On Injury Causation And The Probable Mechanism Of Injury**

Defendant also argues that Dr. Shah lacks the necessary factual foundation to support her testimony on injury causation and the probable injury mechanism, because she has not inspected the vehicle, visited the accident scene, or reviewed the police report, and because she did not have the design specifications for the driver's side door frame. However, Defendant again fails to address that Dr. Shah personally performed Christopher Phelan's autopsy. Based on her 22+

29

each performed. They relied on known accident data and reasonably reconstructed additional data consistent with the known data. Their scientific gathering and testing of data can be validated, and their scientific methodologies are recognized and accepted by the scientific community. Therefore, Plaintiffs' expert evidence certainly will assist the jury to decide the probable facts of this fatal Jeep Wrangler rollover accident.

## V.   CONCLUSION

For the reasons and authorities set forth above, the Court should deny Defendant's Motion To Exclude Expert Evidence And Testimony And Motion For Summary Judgment.

PLAINTIFFS

BY _____
Steven E. Arnold, ct07966
sea@SAlaw.us
Peter M. Van Dyke, ct24747
pvd@SAlaw.us
Stanger & Arnold, LLP
29 South Main Street
West Hartford, CT 06107
Tel. (860) 561-0650
Fax. (860) 561-0646
Their Attorneys

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed on November 12, 2003, postage prepaid, to all counsel and pro se parties of record as follows:

Peter M. Durney, Esq.
Marie E. Chafe, Esq.
James P. Kerr, Esq.
Cornell & Gollub
75 Federal Street
Boston, MA 02110

Lewis H. Goldfarb, Esq.
Hogan & Hartson
875 Third Avenue
New York, NY 10022

Daniel Krisch, Esq.
Horton, Shields & Knox
90 Gillett Street
Hartford, CT 06105

M. Sheila Jeffrey, Esq.
Miller, Canfield, Paddock & Stone, P.L.C.
840 West Long Lake Road, Suite 200
Troy, MI 48098

Terri S. Reiskin, Esq.
James A. Hourihan, Esq.
Hogan & Hartson
555 Thirteenth Street
Washington, DC 20004

_____
Steven E. Arnold

# JEEP ROLLOVER FATALITY ACCIDENT INVESTIGATION & DESIGN EVALUATION

## REPORT NO.: CTA 2002-1181B

Performed for

Steven Arnold, Esq.
Stanger & Arnold
29 South Main Street
West Hartford, CT 06107

By

Irving U. Ojalvo, Sc.D.
Kristopher J. Seluga, S.M.
Richard M. Obert, S.M.
Connecticut Technology Associates
1011 High Ridge Road
Stamford, CT 06905

January 2003

# TABLE OF CONTENTS

List of Figures ................................................................................ ii

Introduction ................................................................................... 1

Details of Incident ......................................................................... 2

Investigation ................................................................................. 4

Testing .......................................................................................... 8

Analyses ....................................................................................... 9

    I. Accident Reconstruction ..................................................... 9

    II. Roll Cage Crush ................................................................. 9

    III. Dynamic Simulation of Jeep Rollover ............................. 10

    IV. Finite Element Analysis ................................................... 16

    V. Roll Cage Strength ........................................................... 16

    VI. Dynamic Simulation of Jeep Guardrail & Light Pole Impacts .... 17

    VII. Dynamic Biomechanical Simulation of Occupant Motion ....... 19

Conclusions ................................................................................ 22

Figures ....................................................................................... 24

Appendicies ..................................................................... A1 – A11

## LIST OF FIGURES

Figure 1: In lane post impact skid marks from the Ford Taurus.................................24

Figure 2: Out of lane post impact skid marks from the Ford Taurus...........................24

Figure 3: Post impact skid marks from the Jeep Wrangler..........................................25

Figure 4: Police sketch showing damaged guardrail....................................................25

Figure 5: Jeep resting place with separated hard top further down the embankment......26

Figure 6: Jeep Wrangler resting place on the embankment..........................................26

Figure 7: Mr. Phelan, fatally wounded inside Jeep Wrangler......................................27

Figure 8: Post accident passenger's side of incident Jeep Wrangler...........................28

Figure 9: Incident Jeep Wrangler as viewed from the front/right-side........................28

Figure 10: Driver's seat and damage without surrogate..............................................29

Figure 11: Driver's seat and roll-cage damage with surrogate....................................29

Figure 12: Accident scene as viewed when approaching exit 10................................30

Figure 13: Area of guardrail (replaced) that Mr. Phelan's vehicle traveled through........30

Figure 14: Tree on which Jeep came to rest (2 years, 8 months after accident)...............31

Figure 15: Light pole knocked down by Mr. Phelan's Jeep........................................31

Figure 16: Guardrail cross-section at accident site......................................................32

Figure 17: Scale drawing of accident scene................................................................33

Figure 18: Scale drawing of crush damage measured on subject Jeep Wrangler.............34

Figure 19: Front crush on Ford Taurus, viewed from passenger's side......................35

Figure 20: Front crush on Ford Taurus, viewed from driver's side.............................35

Figure 21: Test specimens created from exemplar roll cage........................................36

Figure 22: Roll cage test specimen in beam testing apparatus....................................36

Figure 23: Test specimens taken from exemplar windshield frame ............................... 37

Figure 24: Windshield test specimen in beam testing apparatus .................................... 37

Figure 25: Crush produced in windshield beam exemplar test ....................................... 38

Figure 26: Roll cage specimens load deflection curves .................................................. 39

Figure 27: Windshield specimens load deflection curves ............................................... 39

Figure 28: Jeep model used in ATB simulation .............................................................. 40

Figure 29: Roadway and tree used in ATB simulation ................................................... 40

Figure 30: ATB generated force deflection curve for windshield frame during rollover . 41

Figure 31: ATB computed force-time history for windshield frame during rollover ....... 41

Figure 32: Windshield frame cross section before beam testing .................................... 42

Figure 33: Incident windshield frame after rollover impact ........................................... 42

Figure 34: Screen capture of overall Jeep-guardrail simulation ..................................... 43

Figure 35: Screen capture close-up of guardrail post and light pole ............................... 43

Figure 36: Screen capture of initial jeep position for guardrail simulation ..................... 44

Figure 37: Simulated Jeep velocity during guardrail travel ............................................ 44

Figure 38: Photo of Jeep bumper damage ...................................................................... 45

Figure 39: Photo of scratches from guardrail on Jeep underside .................................... 45

Figure 40: ATB model of Jeep interior surfaces ............................................................. 46

Figure 41: ATB Jeep interior model with seated belted driver ....................................... 46

Figure 42: Driver head acceleration during Jeep guardrail simulation ........................... 47

Figure 43: Screen capture of rollover simulation with driver ......................................... 47

Figure 44: Close-up screen capture of rollover simulation with driver .......................... 48

Figure 45: Close-up screen capture of rollover simulation with driver .......................... 48

Figure 46: Driver head-door contact force during rollover ............................................. 49

Figure 47: Driver head acceleration during rollover impact ........................................... 49

Figure 48: Loads on each roll cage member during rollover impact ............................... 50

Figure 49: Driver Head Clearance with 5" Crush to Roof .............................................. 50

Figure 50: Simulated Jeep velocity during rollover ........................................................ 51

# INTRODUCTION

During the second half of 2002, we investigated a January 2000 motor vehicle accident wherein a Jeep Wrangler was struck from behind by a Ford Taurus and caused to travel off a road in Glastonbury, CT. The Jeep mounted a guardrail, struck and knocked down a light pole, and rolled down an embankment. It eventually came to rest, partially on its side and leaning against a tree. Mr. Phelan, the belted driver and sole occupant of the Jeep, was killed due to a severe head injury.

This report, which supercedes its "preliminary" version dated November 2002, details our investigation, research, and engineering analysis of the vehicle collision, post impact travel and post impact biomechanics of the Jeep driver. In addition, it contains our opinions regarding the lack of protection afforded by the Jeep's roll-cage.

## DETAILS OF INCIDENT

On January 18, 2000 at approximately 9:50 PM, Mr. Christopher Phelan was traveling home in the right westbound lane of Route 2 in Glastonbury, CT in his 1994 Jeep Wrangler. It was winter and so Mr. Phelan had the hard top on his vehicle. As he approached Exit 10, where he normally exited on his way home, a 1987 Ford Taurus station wagon, driven by an intoxicated Mr. Christopher Miller, approached him from behind at a very high speed and struck the back end of the Jeep.

The severe impact thrust Mr. Phelan's vehicle forward and towards the right guardrail, while Mr. Miller's vehicle traveled ahead and to the left. Post impact tire marks left by Mr. Miller's vehicle indicated the serpentine path to his vehicle's final resting place (see Figures 1 & 2). These tire marks indicate that Mr. Miller's vehicle had swerved twice, before finally coming to a stop approximately 310 ft from the point of impact.

Mr. Phelan's vehicle also left tire marks on the roadway, for approximately 40 ft, until it reached the northern guardrail (see Figure 3). Upon striking the guardrail, at an angle of approximately 30°, Mr. Phelan's Jeep rode up and straddled the guardrail. It then traveled along and over the guardrail for approximately 100 ft according to the police sketch and testimony (see Figure 4), striking a light post along the way and causing it to topple from its base. After striking the pole and additional guardrail posts, the vehicle descended the northern embankment. As it descended, it started to roll clockwise, as viewed from the rear, and became airborne. While airborne, the Jeep

2