With these data as a starting point, the simulation model was tuned, through scaling of the foot contact functions, until the phasing and amplitude of the distal tibia axial load were within 5% of the measurements from a dynamic pendulum test. The final scaling factor was 1.5. This accounts for viscous damping, as well as for uncertainty regarding the effective contact area of the Hybrid III sole plate versus the indentor size.

## MODEL DEVELOPMENT AND TROUBLESHOOTING

A Hybrid III, lower-extremity pendulum test was conducted, and was used as the benchmark with respect to which the new leg model was tuned. Geometric details of the simulation model are shown schematically in Fig. 8. For the test, the foot was placed flat against the toepan plate, with no inversion or eversion. Sideways forces (Y-direction) were negligible so that significant motion was confined to the X-Z plane. The distal tibia axial load, which peaked at 2900 N, was chosen as the primary target variable since it is very sensitive to the interaction between the foot and toepan, and since the distal tibia load cell is the sole path through which forces and moments are transmitted up the leg.



Figure 8.

Figures 9a-9d show a comparison of test data to the simulation results.









Figure 9.

4

With only minor tuning, excellent agreement was obtained for the distal tibia axial load, but the results for the femur axial load and the Y-axis moments were not quite satisfactory. Numerous simulation runs were performed to establish to which parameters these errant variables were sensitive. Possible candidates were:

- femur and tibia angles
- knee slider joint stiffness and damping
- femur and tibia joint rotational stiffness and damping
- axial compliance, or slip, at the tibia joints
- knee pin joint Coulomb friction
- shoe-to-toepan friction

During the search, the constraint was always imposed that the distal tibia axial load remain within 5% of the measured value.

THE SEARCH FOR FEMUR AXIAL LOAD AND Y-AXIS MOMENT AGREEMENT – Femur and tibia angles were varied (+/-)1.0 degree since this was the uncertainty of the measurements. This had no significant effect on the results. Relevant variables changed by only 1 or 2 percent.

Runs were tried both with the knee slider locked and with reduced stiffness and damping. No significant effect on the results was observed unless unrealistically low values were used.

The load cell joints in the femur and tibia were unlocked and given rotational stiffness and damping characteristics. These parameters could affect the results significantly, but never consistently. An improvement in one result would lead to greater error in another. Furthermore, unrealistically low values were required. In no case did the agreement in the femur axial load improve.

To test the effect of a small amount of axial compliance in the tibia, slip joints with spring-damper elements were added to the tibia load cell joints. Numerous combinations of stiffness and damping were tried. The final conclusion was that the best results obtained with this added degree-of-freedom were no better than the results with no axial slip. This change was abandoned and the simpler, fully locked load cell joints were retained.

Since the Coulomb friction value of the knee joint is not known with great certainty, the model's sensitivity to this parameter was investigated. If the knee was over-tightened, resulting in excessive Coulomb friction, the test results could be significantly affected. However, increasing this parameter reduces the moment in the femur, but causes an increase in the tibia. For better agreement, a reduction in both moments is needed. Furthermore, little effect on femur axial load was observed. The conclusion was that unless the knee were tested and found to have excess rotational friction, there was no justification for changing this parameter.

Another area of uncertainty involves the friction coefficient between the shoe and the toepan. A value of 0.7 had been employed in early model development on the assumption that the rubber soled shoes or rubber dummy feet would have relatively high friction. Coefficients between 0.1 and 1.0 were tested in the simulations with the conclusion that for moderately high values (>0.5) the simulations showed little sensitivity, while at low values agreement became worse. Therefore, the value of 0.7 was retained.

These numerous attempts to improve the agreement between test and simulation through the adjustment of limb model parameters were unsuccessful. The model, however, also includes portions of the test apparatus as well. In particular, the boundary conditions associated with the mounting hardware must be modeled correctly also.

THE PENDULUM TEST HIP CONNECTION – This lack of acceptable results led to a re-examination of the way the limb was mounted in the pendulum test fixture. The actual mechanism is sketched in Fig. 10. While nominally a pin joint, it clearly allows out-of-plane motion due to the slip space in the Y-direction. Also, the hole in the support clevis is larger than the femur connector pin which permits some movement in the X-Z plane. The amount of slip is minimal, but it turned out that the femur axial load was extremely sensitive to this parameter.



Figure 10.

The H-point connection in the model was redefined to allow the pin joint to slip in both the Y and X directions relative to the ground coordinate system. Stiff springs were used to restrain the motion. The Y direction slip was critical to the simulation of the foot inversion test described below. With regard to the femur axial load, it was found that only 0.1 mm of slip space in the X direction, followed by a stiff quadratic spring function of 75,000 $N/cm^2$ produced nearly perfect agreement. The new results for the tibia and femur axial loads are shown in Figs. 11a and 11b.

5





Figure 11.

FEMUR AND PROXIMAL TIBIA JOINT REPOSITION – After the change described above, there were still discrepancies in the Y-axis moments of the femur and the proximal tibia. These remained in error by approximately 60% and 20% respectively. Many of the model parameters discussed above were retried with no success. Finally, the decision was made to examine the effect of moving the load cell joint locations along the X-axis. Immediately, it was found that these moments are very sensitive to this position. Displacing the femur load cell joint +0.5 cm and the proximal tibia load cell joint -0.5 cm produced the model geometry shown in Fig. 12 and the response curves of Figs. 13a and 13b.

PENDULUM TEST WITH INITIALLY INVERTED FOOT – The cases described so far involve motion that is almost exclusively in the X-Z plane. Inverting the foot removes the Y-axis symmetry and causes significant moments to be generated about the X-axis. An additional pendulum test was run with the foot inverted by 10 degrees. In Figs. 14a and 14b, the test results are compared with output from both the original and final models. The original model, with a pure pin joint at the hip, produced an excessive X-axis moment at the proximal tibia while restricting the foot's freedom to rotate. The final model shows excellent agreement at the proximal tibia, as well as considerable improvement in foot rotation. The remaining discrepancy in foot rotation may be associated with ankle joint stiffness or may indicate a subtlety that is not yet accounted for in the model.



Figure 12.





Figure 13.

6





Figure 14.

## FULL-BODY SLED TEST VALIDATIONS

To validate the new Hybrid III ATB/CVS lower-extremity model, the limb from the pendulum simulation was incorporated into a simulation of a sled test with a complete Hybrid III dummy. The occupant positioning data described by Fig. 15 were used to match the occupant and contact surface locations in the simulation to those in the sled environment. Upon completion of the first simulation, two further sled simulations were run corresponding to two different sled tests, 2.298 and 3.320 (Table 1). The major difference between these tests, was the amount of toepan intrusion.

Table 1.  Sled test conditions

| Test Number | delta V (km/h) | Max deceleration (g) | Toepan Intrusion (cm) | Time of Intrusion (ms) |
|---|---|---|---|---|
| 5.293 | 56.8 | 23.3 | 7 | 70 |
| 2.298 | 56.8 | 23.7 | 0 | 0 |
| 3.320 | 56.8 | 23.8 | 22 | 40 |

In the sled tests, the Hybrid III dummy was restrained by a three-point shoulder belt and an energy absorbing knee bolster and steering column. The intrusion simulator provided toepan motion characteristic of frontal offset crashes. The sled test used a deceleration sled with a programmable hydraulic decelerator and a test buck configured as a 1993 Ford Taurus. The change in velocity for the buck was 56.8 Km/h, with a peak deceleration of 23.3 g's. At approximately 70 ms into the test, the toepan assembly intruded into the passenger compartment. The total amount of intrusion was 7cm. The initial positioning of the simulation occupant was approximately that of the occupant in the sled test (Fig. 15 and Table 2).



| | |
|---|---|
| KD | Closest dist. from knee to bolster. |
| CS | Horiz. dist. from chest to steering wheel hub. |
| HW | Horiz. dist. From head to windshield. |
| HH | Distance from head to windshield header. |
| NM | Not measured. |
| TD | Closest dist.--tibia to bolster. |

Figure 15.



Figure 16.

Table 2. Occupant Positioning Data

| TEST: 5.293 | | | | | | |
|---|---|---|---|---|---|---|
| **DIMENSIONS** | | **PHOTO TARGET COORDINATES** | | | **ANGLES** | |
| KD (L) | 11.8 cm | | X | Z | STEERING COLUMN Before | 24.5 deg |
| KD (R) | 11.8 cm | KNEE | 63.8 cm | 22.8 cm | STEERING COLUMN After | 24.5 deg |
| CS | 33.0 cm | ELBOW | 97.6 cm | 33.3 cm | HEAD | 0.0 deg |
| HW | NM | HIP | 101.6 cm | 13.1 cm | PELVIC | 22.5 deg |
| HH | 30.4 | HEAD | 109.7 cm | 77.5 cm | SEAT CUSHION | 8.0 deg |
| TD (L) | 8.1 cm | SHOULDER | 116.4 cm | 51.2 cm | SEAT BACK | 23.5 deg |
| TD (R) | 8.0 cm | ANKLE | 28.4 cm | -0.3 cm | FEMUR (L) | 14.5 deg |
| | | STEERING WHEEL Before | NM | NM | FEMUR (R) | NM |
| | | STEERING WHEEL After | NM | NM | TIBIA (L) | 33.5 deg |
| | | KNEE BOLSTER Before | 46.2 cm | 35.6 cm | TIBIA (R) | NM |
| | | KNEE BOLSTER After | 45.2 cm | 35.8 cm | KNEE BOLSTER | 24.0 deg |
| | | TOEPAN Before | 6.5 cm | 4.2 cm | | |
| | | TOEPAN After | 14.4 cm | 3.9 cm | | |

The experimental geometric test configuration of Fig. 15 was reproduced for the ATB sled simulations (Fig. 16). Some changes were made to the placement of the segments and planes inside the occupant compartment to allow for the correct distances between the segments and the contact planes. Both the knee bolster and steering column were modeled with rigid joints, while in the experimental setup they are actually deformable.

The ATB simulation of the sled test uses the measured sled and toepan X accelerations (Figs. 17 and 18) as the inputs to the system.



Figure 18.



Figure 17.

These accelerations are applied to the vehicle (sled) and to the toepan (toepan). The occupant was first positioned in an equilibrium position. From this position, the placement of the knee bolster assembly was calculated to approximate the initial distance between the knee and the bolster, 11.8 cm. Due to the initial acceleration of the sled up to impact speed, the dummy moved rearward in the seat. For test 5.293, this initial displacement was found to be 2 cm (Table 3) During the sled test, the forefoot was taped to the toepan to prevent the foot from losing contact with the toepan. This taping effect was modeled by changing the initial rotation of the foot, so that after moving the dummy rearward, the forefoot was closer to the toeboard than the heel, and adding a spring between the forefoot and the toeboard. It is this initial displacement, which occurs even though the foot is taped, that causes the first peak in the tibia axial load, Fig 19a [4]. Changing this initial displacement between the foot and toepan affects both the phase and magnitude of the initial peak in the tibia.

The initial peaks in the tibia axial force and Y-axis moment, Figs. 19a and 19b, were matched by changing the initial rearward displacement of the dummy. While the initial peaks were matched, the secondary peak of the tibia axial force, resulting from the intrusion of the toepan, shows some difference in magnitude. Correlation with the femur load, Fig. 19c, was not expected, due to the difficulty in matching the femur loads in the pendulum impact tests. For test 5.293, the right and left femur loads are different, and upon inspection of the films it appears that the right knee had made only partial contact with the knee bolster; which did not occur in the simulation, causing the large difference in loads. The head, chest, and pelvic accelerations (Figs. 19d-19f) are affected mainly by the initial slack in the harness belt and placement of the steering assembly. No attempt was made to match these parameters, but it is noted that they fall within the correct range. For the head accelerations, a 70 g accelerometer was used in the test; because of this, the resultant acceleration is clipped at 70 g's, and an accurate comparison can not be made between the simulation and the test for this parameter.

Upon completing this sled model, two additional sled simulations were done. to verify the validity of the model in different test conditions. The only experimental parameter changed between the test conditions was the amount and timing of toepan intrusion, (Table 1) The simulation from test 5.293 was used with the input accelerations of the sled and toepan being changed to match the current test conditions (Figs. 17 and 18). The only other change made to the model was the amount of initial rearward displacement of the dummy (Table 3)

Table 3. Amount of Rearward displacement of the occupant for each simulation.

| Test Number | Rearward Displacement (cm) |
|---|---|
| 5.293 | 2.0 |
| 2.298 | 3.5 |
| 3.320 | 1.5 |

Results (Figs. 20a-21f) of these additional simulations were similar to the first test with the tibia loads matching on the first peaks and matching in phase on the second peaks. In these two tests, 2.298 and 3.320, different accelerometers were used and now a comparison can be made for the head accelerations (Figs. 20d and 21d)

The newly developed Hybrid III ATB/CVS leg model yields good results for these simulations. The results remained consistent for different test configurations. No changes were made to the leg model itself to get correlation between the simulations and actual tests. All changes were to the simulation of the sled test itself. The most significant change was allowing the foot to lose contact with the toepan initially. In an ideal setup, the foot would allows remain in contact with the toepan, however, because the sled must be accelerated up to impact speed, there is some change in the initial configuration of the occupant. Since these changes are not explicitly known, estimates were made as to their effects; it was assumed that the whole dummy would be displaced a few centimeters. Once these changes were made, an acceptable level of correlation was obtained.

## CONCLUSION

The Hybrid III lower-extremity model exhibited excellent axial load agreement in terms of both peak value and pulse shape. Y-axis moment agreement is very good for peak values and moderate for pulse shape. A very good match to the proximal tibia X-axis moment was also obtained for the inversion test. The remaining area where better agreement is desirable is that of foot rotation.

Unlike earlier models, this model is now capable of providing data at locations which correspond one-to-one with the load cells in the actual dummy, making it suitable for lower-extremity injury studies involving direct comparison to experimental results. Furthermore, its geometrical realism permits the effect of design changes, such as those being discussed for the ALEX (Advanced Lower EXtremity) device, to be explored with confidence.

An important outcome of this project was a greater appreciation of how subtle design factors in a test device can alter modeling results. The model is usually an idealization of what the test is intended to do, so discrepancies between model results and test data can actually help to uncover unexpected behavior in an experimental apparatus. This was seen in the effects of hip fixation for the pendulum cases and in the foot slap behavior described for the sled tests.

## REFERENCES

1. Pellettiere, J. A., E. M. Sieveka, J. R. Crandall, W. D. Pilkey, M. Tanahashi, G. Weisenfeld, "Experimental Testing of the Hybrid III Lower Extremity for Computational Model Development", SAE Paper No. 98B-74.
2. Crandall, J. R., S. M. Klisch, G. S. Klopp, E. Sieveka, W. D. Pilkey, and P. Martin, "Research Program to Investigate Lower Extremity Injuries", SAE Paper No. 940711, 1994
3. General Motors Corporation, "The Hybrid III 50th Percentile Size and Anthropomorphic Test Dummy, Drawing and Specification Package", Detroit, MI, 1986.
4. Crandall, J. R., C. R. Bass, G. S. Klopp, W. D. Pilkey, R. M. Morgan, and R. H. Eppinger, "Sled Tests with Toepan Intrusion using Post-Mortem Human Surrogates and the Hybrid III Dummy", Proceedings IRCOBI Conference on the Biomechanics of Impacts, Dublin, Ireland, September 1996.








Figure 19.








Figure 20.








Figure 21.

21

1

SUPERIOR COURT
JUDICIAL DISTRICT OF TOLLAND AT ROCKVILLE


ANGELA PHELAN, ADMINISTRATRIX
OF THE ESTATE OF CHRISTOPHER A.
PHELAN


VS.                                          X07-CV-01-0075700-S


CHRISTOPHER A. MILLER, ET AL



Deposition of IRVING U. OJALVO taken in accordance with the

Connecticut Practice Book at the offices of Stanger & Arnold,

29 South Main Street, West Hartford, Connecticut, before

Meghan M. English, LSR, a Licensed Shorthand Reporter and

Notary Public, in and for the State of Connecticut on Monday,

December 2, 2002, at 10:34 a.m.


                    MEGHAN M. ENGLISH, LSR
                         LSR NO. 211

Page 54

1  Defendants' Exhibit 5, Gallagher 5. Could you tell me what
2  that document is?
3      A    It's some notes made by one of my assistants,
4  I don't know which one. And it has the license plate of the
5  Jeep and the VIN number of the Jeep, some information about
6  the seat back angle, some details of the incident made by the
7  impact with the tree, and the final resting position, some
8  undercarriage scratches on the Jeep made by the guardrail
9  post, some information about the height of the lamppost and
10 its diameter, and some details of the base and how far the
11 base is from the guardrail, and some details about each post
12 in the guardrail and the spacing of the posts.
13     Q    Am I correct in understanding that the
14 notations about the details of the posts, the tree and the
15 lightpost and the guardrail posts were based on observations
16 at the scene on the second visit in November?
17     A    That's true except for what you said about the
18 tree. There is nothing about the tree in here.
19     Q    I thought you said there was a tree dent?
20     A    Oh, I am sorry. That was the damage to the
21 passenger side axle on the Jeep made by the tree.
22     Q    Okay.
23     A    At its final resting place.
24     Q    But those notes would not have been based on
25 the visit to the scene they would have been based on an

Page 55

1  examination of the vehicle; is that fair to say?
2      A    The part about the tree dent, yes.
3      Q    Correct. Okay. Could you tell me,
4  specifically, what changes have you made in your opinions as
5  they relate to this case from what they are as expressed in
6  your initial report labeled Defendants' Exhibit 3 to the
7  present time, based on your investigation subsequent to
8  preparing that report?
9      A    I don't think we changed any opinions. We
10 just have done some additional work and gained a little more
11 information, like the specific part of the vehicle that had
12 struck his head, gave the final blow.
13     Q    You don't identify anywhere in Defendants'
14 Exhibit 3, your initial report, what specific part of the
15 vehicle struck Mr. Phelan's head, do you?
16     A    That's right. That came later.
17     Q    How did you go about identifying what part
18 struck Mr. Phelan's head?
19     A    I climbed in the vehicle on the second visit,
20 sat in the driver's seat, and tried to imagine what would
21 happen when the A-pillar was crushed. And when I did that --
22 and I have a photograph of it -- I saw that my head would
23 come in contact with this bent frame of the driver's-side
24 window and then obtained some photographs taken at the scene
25 by Trooper Sawyer, and that further bolstered that theory

Page 56

1  that I had.
2      Q    Can you identify specifically for me what
3  portion of the driver's-side window you believe came in
4  contact with Mr. Phelan's head and perhaps describe for me
5  how that occurred?
6      A    Can I use the photographs to do that?
7      Q    Please use the photographs and the exhibits,
8  yes.
9      A    I think these 3 photographs are the most
10 compelling.
11         MR. MEADE: Why don't we just identify
12     which photographs you're referring to for the
13     record. Let's say one of them has previously
14     been marked as Defendants' Exhibit 12 on
15     November 25, 2002. I don't think it's
16     necessary to mark that again. The next does
17     not appear to have been separately identified,
18     so why don't we mark that as Gallagher No. 7.
19         (Gallagher Defendants' Exhibits 7-A and
20         7-B were marked for identification,
21         described in index.)
22 BY MR. MEADE:
23     Q    Okay. You have identified the photographs
24 that you believe illustrate the manner in which, in your
25 opinion, Mr. Phelan suffered the fatal head injury. Can you

Page 57

1  explain to me using those photographs what your opinion is?
2      A    Yes. The first one is the November 25th
3  Exhibit 12 which shows me sitting in the driver's seat, and
4  what I did there was to imagine the force that the windshield
5  frame serving as the A-pillar would have received. And as it
6  received that, I moved my body which was in a seat belt in
7  the direction it would have moved when it received that blow.
8  Essentially, when you're an occupant in a vehicle that
9  receives a blow, your body, the part that's not restrained,
10 will try to move in that direction. And so what I did is I
11 moved my head in that direction and that's where it ended up.
12         MR. ARNOLD: Does that mean the direction
13     of the blow?
14         THE WITNESS: The direction from which
15     the blow came.
16         MR. ARNOLD: Thank you.
17         THE WITNESS: So that's what I did in
18     that particular case, and I had one of my
19     assistants take that photograph. And then
20     when I saw the photographs taken at the scene,
21     I saw that the victim's head was in a position
22     quite similar to what I have, and there is
23     indication of blood and a hard, not really
24     sharp but not smooth, but a thin-edged metal
25     surface there that could have dealt that blow.

15 (Pages 54 to 57)

Page 58

```
 1           And it showed evidence of heavy blood cover,
 2       too, indicating it was most likely the
 3       instrumentality that did it.
 4   BY MR. MEADE:
 5   Q    Did you in the course of your analysis make
 6   any determination as to at what point in the sequence of the
 7   accident the fiberglass hardtop separated from the Jeep
 8   vehicle?
 9   A    Yes, that would have occurred when the blow
10   that crushed the A-pillar occurred or shortly after that.
11   Q    And how did you make that determination?
12   A    That was the blow that was consistent to where
13   it was located postaccident. That was the blow that could
14   have done it, and it was also consistent with where the
15   hardtop was found.
16   Q    Are you aware that at least one of the
17   investigating troopers has identified a substance -- I am
18   going to refer you to Trooper Sawyer's Photograph 33, if you
19   have that available to you.
20   A    I am sure I do. I am very familiar with that
21   photograph.
22   Q    He has identified a substance on one of the
23   guardrail posts on the edge of the roadway as blood. Are you
24   aware of that?
25   A    Yes.
```

Page 59

```
 1   Q    And do you dispute that contention?
 2   A    I think it probably is blood. I don't think
 3   it's Phelan's blood, though.
 4   Q    And have you made any effort to ascertain
 5   where that blood came from?
 6   A    Yes.
 7   Q    And what is your opinion as to where that
 8   blood came from?
 9   A    Well, one of the first witnesses on the
10   scene -- I don't think she was first but one of the first --
11   was a nurse, and she said when she got out of her vehicle she
12   saw the driver of the Ford sitting on the guardrail bleeding
13   profusely with a lot of blood on his face, a cut lip, and he
14   was sitting in that area. And that would be consistent with
15   any blood that you saw on that post.
16   Q    So you believe that was Chris Miller's blood
17   and not Chris Phelan's blood?
18   A    Right.
19   Q    Taking a look at Photo No. 33 again, as
20   Trooper Sawyer Photo 33 --
21   A    Let me find my copy of it. It's somewhere.
22   Q    There is -- at least in my copy there is a
23   substance, a greenish-blue substance scattered around the
24   base of the post. Do you see that?
25   A    Yes.
```

Page 60

```
 1   Q    And have you identified what that substance
 2   is?
 3   A    Glass.
 4   Q    And have you identified where that glass came
 5   from?
 6   A    I think so.
 7   Q    Where do you believe that glass came from?
 8   A    I think it came from the dented hood of the
 9   Ford, and prior to that it was the back window of the Jeep.
10   Q    Do you have any evidence that the Ford came
11   into contact with the guardrail post in the area of the
12   guardrail post depicted in Exhibit 33?
13   A    I didn't think it came in contact with it but
14   it swerved shortly after. Shortly after that it swerved at
15   that point, and that would be when the glass went flying off
16   along with the license plate which is also shown.
17   Q    And that license plate that is shown, that is
18   the license plate from the Ford?
19   A    No. I think that is the license plate from
20   the Jeep which was sitting on the hood along with the glass
21   on the right portion of the photograph, Photograph No. 33.
22   Q    There is a white triangular piece of material
23   and then a smaller irregularly shaped black and white piece
24   of material. Do you see those?
25   A    Yes.
```

Page 61

```
 1   Q    Do you have an opinion as to what those pieces
 2   of material are?
 3   A    Yes.
 4   Q    What are they?
 5   A    Part of the hardtop on the Jeep.
 6   Q    And how did they, in your opinion, come to be
 7   in the area where they are depicted in Exhibit 33?
 8   A    The Ford struck the Jeep and upended the Jeep
 9   so that the front went up and the rear of the Jeep made
10   contact with the hood of the Ford and left a very significant
11   indentation of the spare tire on the Jeep and on the hood of
12   the Ford. It smashed the rear window of the hardtop on the
13   Jeep. The license plate would have come off at that point
14   and glass would be sitting on that dented hood, and as the
15   Ford continued to travel, it eventually came to this
16   particular vicinity. And then before cutting across the
17   road, and at the maneuver where it cut across the road, this
18   debris came sliding off the top of the dented hood.
19       MR. ARNOLD: For the record, you were
20       using your hand to point cutting across the
21       road from the right to the left?
22       THE WITNESS: Well, the best way to do it
23       is to look at the figure that we have in our
24       report of the reconstruction, which we did
25       prior to even seeing those photographs. And I
```

22

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE JEEP WRANGLER CLASS ACTION | : | CIVIL NO. 3:02 CV 1219 (JBA) |
| ANGELA PHELAN, ADMINISTRATRIX OF THE ESTATE OF CHRISTOPHER PHELAN, CLASS MEMBER, AND INDIVIDUALLY | : : : | |
| Plaintiffs | : | |
| VS. | : | |
| DAIMLERCHRYSLER CORPORATION | : | NOVEMBER 12, 2003 |
| Defendant | : | |

### AFFIDAVIT OF WILSON C. HAYES, Ph.D.

STATE OF OREGON       )
                      )  ss: _____ (city)
COUNTY OF _____ )

I, Wilson C. Hayes, Ph.D., being duly sworn, state:

1. I am over the age of eighteen and am competent to give this affidavit.

2. I have personal knowledge of the facts and circumstances set forth herein, and they are true and correct.

3. I have been retained as an expert in the above-captioned matter.

1

4. I have a comprehensive understanding of the facts and scientific principles involved in this case as set forth in my report and deposition testimony attached to Defendant's Motion for Summary Judgment, and as is further indicated in Plaintiff's Objection thereto.

5. I have reviewed portions of DaimlerChrysler's Motion for Summary Judgment and supplement my report and/or prior testimony with the following:

   a. The GATB simulation presented and subsequently used as the basis for my opinions are independent of any occupant dynamics simulation presented by Dr. Ojalvo. I did not accept Dr. Ojalvo's data blindly and every effort was made to independently validate Dr. Ojalvo's analysis.

   b. Prior to incorporating Dr. Ojalvo's data into the GATB simulation, Dr. Ojalvo's report and input files were reviewed in their entirety. The contents of the report and data files were then compared with, among other materials, the State of Connecticut Police Report, including the investigation officer's description of the scene, scene photographs, measurements of the scene, scale diagram of the scene, description of vehicle damage, vehicle photographs, vehicle schematics, witness statements, medical reports, and Chris Phelan's autopsy report and photographs.

   c. GATB is used to evaluate the three-dimensional dynamic response of the human body when subjected to an environment consisting of high-speed inertial and

2

contact forces. The software is used to compute occupant kinematics (position, velocity, and acceleration vs. time), joint angles and torques, and contact forces between the human occupant and contact panels attached to the interior of the vehicle.

/s/ _____ *
Wilson C. Hayes, Ph.D.

Subscribed and sworn to before me
This ____th day of November, 2003.

_____
Notary Public

My Commission Expires:

\*      The notarized copy of Dr. Hayes' Affidavit will be filed with the Court upon its receipt.

3