UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE JEEP WRANGLER CLASS ACTION | : | CIVIL NO. 3:02 CV 1219 (JBA) |
| | : | |
| ANGELA PHELAN, ADMINISTRATRIX OF | : | |
| THE ESTATE OF CHRISTOPHER PHELAN, | : | |
| CLASS MEMBER, AND INDIVIDUALLY | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| VS. | : | |
| | : | |
| DAIMLERCHYSLER CORPORATION | : | NOVEMBER 14, 2003 |
| | : | |
| Defendant | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' RENEWED MOTION TO COMPEL DEFENDANT'S
RESPONSES TO PLAINTIFFS' FIRST SET OF PRODUCT LIABILITY
INTERROGATORIES AND REQUESTS FOR PRODUCTION**

Pursuant to the Court's July 10, 2003 Ruling on Plaintiffs' Motion To Compel and its

October 21, 2003 Ruling on Plaintiffs' Motion For Extension Of Time To Complete Product

Discovery, and in accordance with Fed.R.Civ.P. 37 and D.Conn.L.Civ.R. 37, Plaintiffs submit

this Memorandum of Law In Support Of Plaintiffs' Renewed Motion to Compel Defendant's

Responses To Plaintiffs' First Set Of Product Liability Interrogatories And Requests For

Production.  Plaintiffs incorporate by reference the reasons and authorities set forth in their May

19, 2003 Motion To Compel, and their June 17, 2003 Reply To Defendant's Opposition To

Plaintiffs' Motion To Compel.

l

**STANGER & ARNOLD, LLP**
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

## I.     NATURE OF CASE

The Plaintiff estate of Christopher Phelan brings this product liability action for his wrongful death, claiming that the roll cage system of Defendant's Jeep Wrangler (YJ) sports utility vehicle is defective and caused Christopher Phelan's death in his Jeep Wrangler rollover accident. The Plaintiff estate also brings this Connecticut Unfair Trade Practices action on behalf of itself and her putative class of Connecticut Jeep Wrangler (YJ) owners for their economic loss of bargain damages. On May 19, 2003, Plaintiffs filed their Motion to Compel Defendant's Responses to Plaintiffs' First Set of Product Liability Interrogatories and Requests for Production. On July 10, 2003, the Court denied Plaintiffs' Motion To Compel without prejudice to renew, with additional evidence, from an expert, that there were only relatively minor differences between the roll cage systems of the Jeep Wrangler (YJ) and Jeep Wrangler (TJ).

## II.     LAW

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action." Fed. R. Civ. P. 26(b)(1). "Information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery." Omega Eng'g, Inc. v. Omega, S.A., 2001 U.S. Dist. Lexis 2016, *5 (D.Conn. 2001). "The term 'reasonably calculated' as used in Rule 26 means 'any possibility that the information sought may be relevant to the subject matter of the action'" Id. (citing Morse/Diesel, Inc. v. Fidelity & Deposit Co., 122 F.R.D. 447, 449 (S.D.N.Y. 1988)).

2

In determining relevancy in the product liability context, courts make the following inquiry:

> In product liability actions it is frequently difficult to judge which of a manufacturer's products are sufficiently similar to the allegedly defective product to be subject to discovery. Generally, different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation. . .
>
> On the other hand, where there has been no suggestion that other models share pertinent characteristics with the products at issue, discovery relating to those objects will be disallowed. . . .

Fine v. Facet Aerospace Prods. Co., 133 F.R.D. 439, 441-42 (S.D.N.Y. 1990).

## III.     ARGUMENT

As per the Court's July 10, 2003 Ruling, Plaintiffs are consulting with an expert, Mr. James M. Mundo of American Automotive Design, to confirm that there are only relatively minor differences between the roll cage systems of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ). Exh. 1 (CV – James Mundo). In order for Mr. Mundo to thoroughly evaluate and counter the design distinctions cited by Defendant's expert, Leon Neal, Mr. Mundo has requested the engineering drawings for both the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) roll cage systems. Despite exhaustive efforts, as yet, Plaintiffs have been unable to obtain engineering drawings for the Jeep Wrangler (TJ) roll cage system. Plaintiffs recently located an independent source for these engineering drawings so they can be provided to Mr. Mundo. Mr. Mundo's expert Affidavit is expected to confirm that there are only minor differences between Defendant's design of the roll cage systems of the Jeep Wrangler (YJ) and Jeep Wrangler (TJ).

3

Plaintiffs will supplement their Renewed Motion To Compel with Mr. Mundo's Affidavit upon its receipt.

Defendant's Jeep Wrangler (TJ) release engineer, Peter Chapman, worked on the Jeep Wrangler (TJ) roll cage system design, including its windshield and sport bar, and he testified on behalf of Defendant in a separate action involving a Jeep Wrangler (YJ) accident. Exh. 2, at 7 (Deposition – Peter Chapman). Mr. Chapman testified that there are only minor differences between the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) roll cage systems, and that the Jeep Wrangler (TJ) roll cage system, including the A-Pillar and sport bar, share the same design defect issues pertinent to those in this case:

> Q.    Do you know how the TJ model differs from the YJ model?
>
> A.    In design, yes.
>
> Q.    In particular with regard to the sport bar does the TJ model differ from the YJ model?
>
> A.    Yes, some minor changes.
>
> Q.    What are those changes?
>
> A.    The main hoop of the sport bar was formerly a two-piece, became a three-piece. The styling attachment of the side bar was modified, and an additional attachment was made into the B-pillar.
>
> Q.    What about the windshield, did it change from the YJ to the TJ?
>
> A.    Only inasmuch as it was a new windshield. The basic design concept stayed the same.
>
> Q.    Was the A-pillar changed in any way in the TJ versus the YJ?

4

> A.    Again, only inasmuch as it was a new windshield, so the basic panels
>        were redesigned but in the same format.

<u>Exh</u>. 2, at 10.

Mr. Chapman also testified that Defendant used "the '95 [Jeep Wrangler (YJ)] ... as a

benchmark to do the '97 [Jeep Wrangler (TJ)]," and that Defendant made use of all of the Jeep

Wrangler (YJ) design and release drawing work, as well as input from Defendant's Jeep Wrangler

structures group for Defendant's Jeep Wrangler (TJ) design. <u>Id</u>. at 26-27.  In addition, Mr.

Chapman testified that the "minor changes" to the Jeep Wrangler (TJ) sport bar were not related

to the vehicle structure, but rather were made to eliminate wind noise, water leaks, and buzz,

squeak and rattle noises (BSR noises). <u>Id</u>. at 14-18.  Mr. Chapman also was responsible for

recommending a change to the Jeep Wrangler (TJ) B-Pillar, only to improve door sealing to

eliminate door BSR noises. <u>Id</u>. at 20-21.  Mr. Chapman testified:

> Q.    Other than the wind noise and water leaks, are you aware of any problems
>        that were reported with the YJ that the TJ design was intended to correct
>        or improve?
>        …
>
> A.    Not specific problems because the TJ was originally meant to be a facelift
>        vehicle which means tighten the existing vehicle, make some physical
>        changes that people could see that made it look like a different vehicle, so
>        the intent was to carry over as much of the existing vehicle as possible.
>        …
>
> Q.    So from your standpoint the TJ was simply a facelift vehicle, though it
>        was trying to correct the wind noise and water leak customer complaint?
>
> A.    And I've mentioned other things like noise, vibration, buzz, squeak and
>        rattle, just to make it generally feel like a better vehicle for the customer.

5

**STANGER & ARNOLD, LLP**

29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

Exh. 2, at 28-29.

Simply stated, Defendant's "intent was to carry over as much of the existing [Jeep Wrangler (YJ)] vehicle as possible [into the Jeep Wrangler (TJ) design]. Id.

The deposition testimony of Defendant's Jeep Wrangler (TJ) release engineer makes it clear that, contrary to Defendant's proffered Affidavit of Mr. Neal, there are only relatively minor differences between the roll cage systems of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ). Moreover, the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) roll cage systems, including the windshield/A-Pillar, remain substantially similar, thus making the Jeep Wrangler (TJ) roll cage system design pertinent in this action. Facet Aerospace Products. 133 F.R.D. at 441-42. Furthermore, the fact that Defendant intended for the design of the Jeep Wrangler (TJ) sports bar "to carry over the YJ sports bar," creates a direct relevancy nexus between the Jeep Wrangler (YJ) and Jeep Wrangler (TJ) roll cage systems. Exh. 2, at 36-37; Omega Eng'g, Inc. v. Omega, S.A., 2001 U.S. Dist. Lexis 2016, *5. The Jeep Wrangler (TJ) documents and information that Plaintiffs seek to compel Defendant to produce are relevant, or may lead to relevant information, for the following reasons.

The design process to revise and improve the Jeep Wrangler (YJ) into the Jeep Wrangler (TJ) model began in 1993, a year prior to the manufacture of Chris Phelan's Jeep Wrangler (YJ). Any documents developed during this year will shed light on Defendant's knowledge concerning the Jeep Wrangler (YJ) roll cage system (in turn, triggering the duty to warn), and possible design alternatives that could have been implemented prior to the manufacture of Chris Phelan's

6

Jeep Wrangler (YJ).  In addition, the Jeep Wrangler (TJ) documents will help determine whether

Defendant should have sent product warnings, retrofits, or recall notices to Jeep Wrangler (YJ)

owners and operators up until the time of Chris Phelan's fatal rollover accident in 2000.  Any

information concerning Jeep Wrangler (TJ) lawsuits or complaints are relevant to Defendant's

failure to warn Jeep Wrangler (YJ) owners and operators of any unsafe roll cage system design.

Defendant's marketing materials, literature, decals relating to the capabilities or description of the

Jeep Wrangler (TJ) model is relevant to the Jeep Wrangler (YJ) model because of the similar roll

cage systems design.

Defendant also has produced an unsubstantiated 1-page FMVSS-related 216 roof crush

test that Defendant purportedly ran on a Jeep Wrangler (YJ) during the period when the Jeep

Wrangler (TJ) was being developed.  Defendant's purported test document lacks the usual and

necessary validation data, and Defendant represented that it was found lying around in

Defendant's engineering department when a second search effort by Defendant's litigation

employee, Mr. Neal, was conducted.  Exh. 3, at 71-81 (Deposition – Leon Neal).  Defendant's

purported test document was not found where similar engineering documents are ordinarily

maintained.  Id.  Defendant's Jeep Wrangler (TJ) roll cage system documents or information

requested by Plaintiffs' discovery may help determine whether Defendant's unsubstantiated

FMVSS 216-related roof crush test every occurred, or is valid or relevant in this case.

7

## IV.    CONCLUSION

For the reasons and authorities set forth above, Plaintiffs request that the Court grant Plaintiffs' Renewed Motion To Compel Defendant's Responses To Plaintiffs' First Set Of Product Liability Interrogatories And Requests For Production, and order Defendant to comply with Plaintiffs' discovery requests within ten (10) days of the Court's order.

Respectfully submitted,
PLAINTIFFS

BY _____

Steven E. Arnold, ct07966
sea@SAlaw.us
Peter M. Van Dyke, ct24747
pvd@SAlaw.us
Stanger & Arnold, LLP
29 South Main Street
West Hartford, CT 06107
Tel. (860) 561-0650
Fax. (860) 561-0646
Their Attorneys

8

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed on November 14, 2003, postage prepaid, to all counsel and pro se parties of record as follows:

Peter M. Durney, Esq.
Marie E. Chafe, Esq.
James P. Kerr, Esq.
Cornell & Gollub
75 Federal Street
Boston, MA 02110

Daniel Krisch, Esq.
Horton, Shields & Knox
90 Gillett Street
Hartford, CT 06105

Terri S. Reiskin, Esq.
James A. Hourihan, Esq.
Hogan & Hartson
555 Thirteenth Street
Washington, DC 20004

Lewis H. Goldfarb, Esq.
Hogan & Hartson
875 Third Avenue
New York, NY 10022

M. Sheila Jeffrey, Esq.
Miller, Canfield, Paddock & Stone, P.L.C.
840 West Long Lake Road, Suite 200
Troy, MI 48098

Steven E. Arnold

9

James D. Mundo
CURRICULUM VITAE

Summary

- Thirty-one years experience in the Automotive Industry

- Engineering expertise from conventional through electric and
  alternative fuel vehicles

- Hands on cradle-to-grave engineering experience for numerous
  product lines

- Extensive experience with US, Canadian and European crash
  safety standards

- Designed, built and implemented first US/Swedish heavy truck
  crash safety facility

- International design engineering experience with European and
  Japanese vehicles

- Served as Ford's Crash Safety Technical Specialist for all NAAO
  product lines

- Taught crash safety design techniques in Ford's US and European
  engineering centers

- Formulated and published Ford corporate standard engineering
  safety guidelines

- Founded American Automotive Design


Employment History

American Automotive Design, Canton, Michigan 1986-present
Position:   Founder and Owner

      Negotiated and awarded numerous multifaceted and multilevel engineering
      contracts with Ford, General Motors, BMW, Modern, SDRC, TDM and others.
      Contracts ranged from FMVSS crash safety programs through production
      vehicle redesign for alternative fuel and electric vehicle systems.


SDRC, Madison Heights, Michigan 1985-1986
Position:   Senior Consultant Engineer

      Organized, staffed and trained a new Design Engineering Department to:
            - execute total design programs
            - integrate engineering analysis into design process
            - develop procedures for cycle testing components on computer driven
              test equipment

Volvo White Corporation, Greensboro, North Carolina 1983-1985
Position:   Special Assistant to Director of Engineering

      Assigned to technical projects of specific interest to the company.

            - established heavy truck domestic vehicle crashworthiness safety

programs
- revised Swedish design standards to comply with US/Canadian FMVSS standards
- designed, built and implemented first US/Swedish heavy truck crash safety facility

Ford Motor Company, Dearborn, Michigan 1972-1983
Position:   Safety Technical Specialist
                    Design Engineering Supervisor
                    Senior Design Engineer
                    Product Development Engineer
                    Product Design Engineer

    Direct major program experience in each phase of the design, development and manufacture of automotive products from cradle-to-grave.

        - safety specialist responsible for NAAO product compliance to FMVSS crash regulations
        - supervision of Taurus vehicle design engineering group
        - formulated and issued corporate engineering technology guidelines
        - pioneered static and dynamic structural safety design techniques
        - coordinated major design programs with both Europe and Japan

McDonnell Douglas Aircraft Company, St. Louis, Missouri 1970-1972
Position: Airframe Structural Design Engineer
                    Configuration Aerodynamicist

    Direct experience with F-15 aircraft and Harpoon missile in airframe structures design, materials development and aerodynamics.

        - structural design, loads, stress and fatigue analysis
        - aerodynamic surface configuration and performance

Areas of Distinction

US Patents
 - mechanical propulsion systems
 - bumper safety systems

Organizations
Member in good standing, Society of Automotive Engineers

Education

    Graduate: University of Michigan, Professional Development in Engineering Degree, 1976

    Undergraduate: Northrop University, Bachelor of Science in Aerospace Engineering, 1970

00001

1                    IN THE CIRCUIT COURT OF TENNESSEE

2            FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

3

4        JAMES W. GILLESPIE and SANDRA

5        GILLESPIE, Parents and Next

6        of Kin of JAMES WADE GILLESPIE,

7        Deceased,

8

9                        Plaintiffs,

10

11            vs                        Case No. 76600-9

12

13       DAIMLERCHRYSLER CORPORATION

14       and JEEP EAGLE, Division of

15       the Chrysler Corporation,

16

17                       Defendants.

18                                                /

19       DEPONENT:    PETER CHAPMAN

20       DATE:        Monday, October 30, 2000

21       TIME:        9:50 a.m.

22       LOCATION:    840 West Long Lake Road, Suite 200

23                    Troy, Michigan

24       REPORTER:    Denise M. Kizy, RPR/CSR-2466

25       VIDEO:       Tim Reitman and James Walker

00002

1        APPEARANCES:

2

3          WOLFF ARDIS, P.C.

4          By:  Mr. Daniel K. Evans

5          6055 Primacy Parkway, Suite 360

6          Memphis, Tennessee 38119-5776

7          (901) 763-3336

8               Appearing on behalf of the Plaintiffs

9

10         MILLER, CANFIELD, PADDOCK & STONE

11         By:  Mr. Stephen J. Ott

12         840 West Long Lake Road, Suite 200

13         Troy, Michigan 48098

14         (248) 879-2000

15              Appearing on behalf of the Defendants

16

17

18

19

20

21

22

23

24

25

00003

1                        TABLE OF CONTENTS

2     WITNESS                                    PAGE

3          PETER CHAPMAN

4               Examination by Mr. Evans          4

5               Examination by Mr. Ott           32

```
 6              Reexamination by Mr. Evans              35
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00004
 1                          Troy, Michigan
 2                          Monday, October 30, 2000
 3                          At about 9:50 a.m.
 4                              *       *       *
 5
 6              VIDEO OPERATOR:  Today's date is
 7      October 30, year 2000.  We're on the record at 9:47
 8      a.m.
```

9          This is the video deposition of Mr.

10    Peter Chapman at the law offices of Miller, Canfield

11    Paddock and Stone in Troy, Michigan.

12          This is the matter of Gillespie

13    versus DaimlerChrysler Corporation.

14          Counsel, can you put your appearance

15    on the record, please.

16          MR. EVANS:  My name is Daniel K.

17    Evans from the law firm of Wolff Ardis, P.C.

18          I represent the plaintiffs, the

19    Gillespies.

20          MR. OTT:  My name is Steve Ott.

21          I represent DaimlerChrysler

22    Corporation and the witness, Mr. Chapman.

23          VIDEO OPERATOR:  Would you raise your

24    right hand.

25                    PETER CHAPMAN

00005

1     was thereupon called as a witness herein, and after

2     having first been duly sworn to tell the truth, the

3     whole truth, and nothing but the truth, was examined

4     and testified as follows:

5                      EXAMINATION

6     BY MR. EVANS:

7          Q.   Mr. Chapman, as I introduced myself, I'm

8     Dan Evans.  I represent the plaintiffs in this

9     matter.

10          I appreciate your coming today to

11    answer some questions.  I know you've been deposed

12    before.

13              I'm not here to try to trick you, but

14    I also don't know the terminology that you may use

15    in your profession, and so if there are times that I

16    ask an inarticulate question or use a term wrong,

17    please ask me to clarify something so we can have a

18    clear record to the extent we can.

19              How long have you worked for

20    DaimlerChrysler?

21        A.   As a direct employee I'd say just over six

22    years, and I was for them with just over one year

23    before that on a contract basis.

24        Q.   Am I correct that you were the release

25    engineer on the TJ Jeep Wrangler?

00006

1         A.   Yes, I was at one stage.

2         Q.   And do I understand that the internal

3    designation for the Jeep Wrangler prior to 1996 was

4    the YJ?

5         A.   Yes, it was.

6         Q.   And there was no Jeep Wrangler for the

7    1996 model year?

8         A.   I believe that is correct.

9         Q.   And then the internal designation for the

10    Jeep Wrangler starting in 1997 was the TJ model?

11        A.   Yes, it was.

12        Q.   You said that you were the release

13    engineering for the TJ at some point in time.

14              What period of time was that?

15          A.    I started in 1993 and in various positions

16    through until about 1996.

17          Q.    And I believe it would have been the 1993

18    calendar year or thereabouts that you were on a

19    contract basis with DaimlerChrysler?

20          A.    Yes, I was.

21          Q.    Were you working for another corporation

22    at that time?

23          A.    I was working for an English company

24    called Technicon.

25          Q.    And what were your responsibilities there?

00007

1           A.    With Technicon I never actually worked in

2     the office for them, but I just worked through them.

3     They contracted my services out.

4           Q.    And what was the purpose of the contract

5     with DaimlerChrysler in approximately 1993?

6           A.    To design release, product release,

7     engineering.

8           Q.    The TJ?

9           A.    Yes, it was.

10          Q.    Was it specifically for that model?

11          A.    No, I believe it was specifically for Jeep

12    rather than one model, but I was assigned to the TJ.

13          Q.    Did you do any work on any other model

14    other than the TJ?

15          A.    Not at that time.

16          Q.    For the period 1993 through 1996 tell me

17    what you did with regard to the TJ model of the

18      Wrangler?

19              A.   I worked for the body-in-white design

20      release group covering areas such as floor pans,

21      body sides, wheel houses, sport bar, windshield.

22              Q.   Was work being done in 1993 on the TJ

23      model?

24              A.   Yes, it was.

25              Q.   So you joined a team working on that

00008

1       model?

2               A.   Yes, I did.

3               Q.   Who was in charge of the team working on

4       the TJ?

5               A.   William Grabowski was the department

6       manager and Jerry Oseski was the department

7       supervisor.

8               Q.   When you joined that team did you report

9       to them?

10              A.   I reported to Jerry, yes.

11              Q.   Now you said that you worked on the

12      windshield and the sport bar?

13              A.   Yes, I did.

14              Q.   What is a sport bar?

15              A.   It is part of the body-in-white structure.

16              Q.   Where does it exist on the vehicle?

17          -   A.   It attaches to the windshield, to the

18      floor and to the rear wheel houses.

19              Q.   Are you familiar with the term roll bar?

20              A.   Yes, I am.

21          Q.    Does the term roll bar have a different

22    meaning other than a sport bar?

23                  MR. OTT:   Object to form.

24          Q.    (BY MR. EVANS)   In your experience?

25          A.    I would say in my experience, yes, it

00009

1    does.

2          Q.    What's the difference between a roll bar

3    and a sport bar to you?

4          A.    I believe a roll bar is put in there

5    really purely to protect in a rollover accident.

6          Q.    And what about a sport bar?

7          A.    This particular sport bar which is the

8    only one I can speak for was put in to complete the

9    body structure.

10          Q.    This is the only sport bar that you've

11    worked with?

12          A.    Yes, it is.

13          Q.    Why was the decision made in the TJ to use

14    a sport bar rather than a roll bar?

15          A.    I cannot answer that question.

16          Q.    That decision was made prior to your

17    joining the team?

18          A.    Yes, it was.

19          Q.    In doing the work on the TJ did you

20    evaluate the YJ model that existed prior to 1996?

21          A.    No, I did not.

22          Q.    Do you know how the TJ model differs from

23    the YJ model?

24          A.    In design, yes.

25          Q.    In particular with regard to the sport bar

00010

1    does the TJ model differ from the YJ model?

2           A.    Yes, some minor changes.

3           Q.    What are those changes?

4           A.    The main hoop of the sport bar was

5    formerly a two-piece, became a three-piece.  The

6    styling attachment of the side bar was modified, and

7    an additional attachment was made into the B-pillar.

8           Q.    What about the windshield, did it change

9    from the YJ to the TJ?

10          A.    Only inasmuch as it was a new windshield.

11   The basic design concept stayed the same.

12          Q.    Was the A-pillar changed in any way in the

13   TJ versus the YJ?

14          A.    Again, only inasmuch as it was a new

15   windshield, so the basic panels were redesigned but

16   in the same format.

17          Q.    Did you do any work with regard to the

18   seat belts in the TJ?

19          A.    I'd have to ask you to clarify that

20   question.

21          Q.    I assume you're asking me to clarify what

22   kind of work, you're not asking me to clarify the

23   seat belt area?

24          A.    No.

25          Q.    Okay.  Earlier when I asked for your

00011

1       involvement with regard to the TJ you gave me the

2       floor pans, the body sides, wheel housing I believe,

3       the sport bar and the windshield.

4                       I want to know whether or not you had

5       any operational responsibility for the seat belts

6       that were put in the TJ.

7               A.      For the seat belts themselves, no.

8               Q.      What about their attachment points?

9               A.      I would have been responsible for making

10      sure the attachment points were secure and in the

11      recommended locations.

12              Q.      Did the attachment points for the seat

13      belt change in any way from the YJ to the TJ?

14              A.      I couldn't be a hundred percent sure, but

15      I believe not.

16              Q.      Let's go back to the sport bar.

17                      You said that one of the changes was

18      it became a three-piece?

19              A.      Yes.

20              Q.      Were you responsible for making that

21      decision?

22              A.      I was part of the team who made the

23      decision.

24              Q.      Who were the other members of that team?

25              A.      There would have been representation from

00012

1       our body structures group.

2                       There was definitely representation

3       from our Toledo manufacturing facility.

4        Q.   Was this a formal group or an informal

5   working group in essence?

6        A.   It was an informal working group.

7        Q.   Did you have the responsibility for making

8   the decision to go to a three piece with input from

9   these other areas?

10       A.   No, I didn't personally make the decision.

11       Q.   Who made the decision if you know?

12            MR. OTT:  Object to form.

13            THE WITNESS:  I don't know.

14       Q.   (BY MR. EVANS)  Do you know the names of

15   anyone in the body structure group from which you

16   received input?

17       A.   Two names would come to mind, one would be

18   Rich Friday and the second one would be Adrian Van

19   Campenhout.

20       Q.   And do you recall any names from which you

21   would have received input from the Toledo

22   manufacturing group?

23       A.   No, I don't.

24       Q.   You're still employed by DaimlerChrysler;

25   right?

00013

1        A.   Yes, I am.

2        Q.   To your knowledge is Rich Friday still

3   employed?

4        A.   Yes, he is.

5        Q.   And what about Adrian?

6        A.   Yes, he is.

7       Q.    What were the advantages of going to a

8       three-piece sport bar on the main hoop?

9       A.    The advantages and the reason why we did

10      it was for dimensional control.

11      Q.    And can you explain to the jury what you

12      mean by dimensional control?

13      A.    Yes.

14                    As you're probably well aware the

15      sport bar is bolted into the vehicle.  A sport bar

16      is a very solid and firm structure and quite large

17      in its design, and what we wanted to do was when we

18      bolted it into the body to be able to not deform the

19      rest of the body and actually control the shape,

20      keep everything the way we wanted it to be, so the

21      bar was split up to give us the ability to do that.

22      Q.    Was the two-piece bar incapable of

23      maintaining dimensional control?

24      A.    To the level we required, it was not good.

25      Q.    When you say the level we required, who is

00014

1       the we that we're talking about?

2       A.    Speaking we as the producer of the

3       vehicle.

4       Q.    If you do not maintain acceptable

5       dimensional control what happens to the vehicle in

6       an accident?

7                    MR. OTT:  Object to form.

8                    THE WITNESS:  I would say its

9       performance in an accident would not change.

10      Q.   (BY MR. EVANS)   How would the performance

11      change if you cannot maintain proper dimensional

12      control?

13      A.   We got wind noise and water leaks that we

14      didn't like, that the customer didn't like, wind

15      noise and water leaks.

16      Q.   And how did those occur?

17      A.   The sport bar basically sets the

18      windshield location and was used to attach a frame

19      to the doors sealed up against.

20      Q.   Would the sport bar in essence flex when

21      the vehicle was in motion?

22      A.   The whole body structure does.

23      Q.   And the flexing allows for space to be

24      created between the sport bar and either the

25      windshield or the door framing?

00015

1            MR. OTT:   Object to form.

2            THE WITNESS:   Certainly not to the

3       windshield, but it would allow for a door frame to

4       open and close for wind noise.

5            Q.   (BY MR. EVANS)   And just so we're clear,

6       we're talking about a very minimal space that we're

7       talking about opening up?

8            A.   Very much so.   Could be as small as half a

9       millimeter.

10      Q.   What role does the sport bar play in the

11      TJ with regard to energy absorption in an accident,

12      if any?

13        A.   I'm not qualified to answer that.

14        Q.   How does a three-piece sport bar allow for

15  more dimensional control than a two-piece sport bar?

16        A.   The sport bar is a fairly large tubulous

17  section that is bent, deformed into shape.  Trying

18  to hold it across the width of vehicle dimensioning

19  to within the kind of tolerances we need is quite

20  difficult.  Wiling an extra strip joint into the

21  design, we were able to control that cross-car

22  dimension to a more accurate level.

23        Q.   You mentioned a moment ago the standards

24  which you wanted to meet with regard to the

25  dimensional control.

00016

1                What standards were those?

2        A.   They are set up for each vehicle.

3        Q.   Are you simply referring to the

4  specifications for the vehicle?

5        A.   That a team would set at the start of the

6  program, yes.

7        Q.   Are there quality standards that have to

8  be met with each vehicle that are company wide or

9  vehicle wide?

10        A.   I don't know if you can clarify that any

11  more.

12        Q.   Does Chrysler have any standards for which

13  all of their vehicles must meet?

14        A.   Yes, they do.

15        Q.   What are those standards referred to?

16          A.    There are fairly wide-reaching standards.

17    They take into account fit, finish, performance.

18          Q.    Is there a name for those standards?

19          A.    Not that I know of.

20          Q.    And you also mentioned that the TJ model

21    differed from the YJ model with regard to the sport

22    bar in attachment points?

23          A.    Yes.

24          Q.    Why were those changes made?

25          A.    To try and improve the dimensional quality

00017

1     of the vehicle and to try and improve its torsional

2     and dynamic bending properties.

3           Q.    I believe you said that there was an

4     attachment point at the B-pillar in the TJ?

5           A.    Yes, there was.

6           Q.    And there was not one on the YJ?

7           A.    Not to the upper B-pillar.

8           Q.    How else did the attachment points change

9     between the TJ and the YJ?

10          A.    The attachments at the lower B-pillar I

11    think were turned through 90 degrees.  Basically I

12    think the rest of them were fairly similar.

13          Q.    Did you say turned to 90 degrees?

14          A.    Through 90 degrees.

15          Q.    Through 90 degrees?

16          A.    Yeah.

17          Q.    And I believe you said that there were two

18    reasons for the attachment points changes; one was