UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

IN RE JEEP WRANGLER CLASS ACTION

CIVIL NO. 3:02 CV 1219 JBA

ANGELA PHELAN, ADMINISTRATRIX OF
THE ESTATE OF CHRISTOPHER PHELAN,
CLASS MEMBER, AND INDIVIDUALLY

Plaintiffs

VS.

DAIMLERCHRYSLER CORPORATION

Defendant

FILED

U.S. DISTRICT COURT
NEW HAVEN, CONN.

## DAIMLERCHRYSLER CORPORATION'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO COMPEL

Defendant, DaimlerChrysler Corporation, submits this brief in opposition to Plaintiffs' Renewed Motion to Compel more specific responses to the combined set of Interrogatories and Requests for Production.

**I.   INTRODUCTION**

The vehicle that is the subject of this lawsuit is a 1994 Jeep Wrangler (YJ). In response to discovery requests, DaimlerChrysler Corporation provided documents related to all model years (1987-1995) of the Jeep Wrangler (YJ). In May 2003, Plaintiffs filed a Motion to Compel, arguing that DaimlerChrysler Corporation should also have provided documents related to the Jeep Wrangler (TJ), an all-new vehicle first produced in the 1997 model year. Plaintiffs argued that there were only minor differences in the roll bar structure of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) and, as such, DaimlerChrysler Corporation should be compelled to produce design,

test, and other documents related to the Jeep Wrangler (TJ)[1]. By order of July 10, 2003, the court denied the motion "without prejudice to renew, with additional evidence, from an expert, that the differences are only 'relatively minor differences.'" (Emphasis in original)

On August 15, 2003, the date of the discovery deadline in this action, Plaintiffs filed a Motion for Extension of Time to Complete Discovery. By the court's order of October 21, 2003, the court stated that if Plaintiffs wanted to renew their motion, they "must do so on or before November 14, 2003." (Emphasis in original) True to form, at the very last moment, on November 14, 2003, Plaintiffs filed this Renewed Motion to Compel. This is part of a pattern of dilatory discovery practices by Plaintiffs since instituting this lawsuit.

## II.   LEGAL ARGUMENT

### A.   The Renewed Motion Should Be Denied Because, Contrary to Court Order, Plaintiffs Have Not Submitted an Expert Affidavit.

The Court's order of July 10 required that the Renewed Motion to Compel include additional evidence *from an expert* pertaining to the alleged minor differences in the open body structure of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ). Plaintiffs have violated the order by failing to submit an expert affidavit with the motion. Plaintiffs claim that they have an expert, James Mundo, who "is expected to confirm that there are only minor differences between Defendant's design of the roll cage systems of the Jeep Wrangler (YJ) and Jeep Wrangler (TJ)."

---

[1] . The discovery requests for which Plaintiffs seek more specific responses are listed in the proposed order that accompanied the motion. Three of those discovery requests do not seek information about the Jeep Wrangler (YJ). Interrogatory No. 33 seeks information about trial witnesses, Interrogatory No. 14 seeks information about inspections of the Phelan vehicle, and Request No. 2 seeks the basis of DaimlerChrysler Corporation's defense asserted to the Third Count of the Complaint.

(Plaintiffs' Brief, p. 3) Plaintiffs state that they will "supplement their Renewed Motion to Compel with Mr. Mundo's Affidavit upon its receipt." (Plaintiffs' Brief, p. 4)

Once again, Plaintiffs have failed to comply with a clearly-worded discovery deadline. By claiming that they will "supplement" their motion with an affidavit they are, in effect, delaying the November 14 cut-off for the Renewed Motion to Compel. The Court should not permit this bald attempt to avoid the Court's Order of July 10, particularly in view of Plaintiffs' dilatory discovery practices over the entire course of this lawsuit. The renewed motion was to be accompanied by additional evidence from an expert. An expert's affidavit was not provided with the motion. The motion should therefore be denied.

### B. The Differences in the Open Body Structure of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) Are Not Minor.

Attached as Exhibit A is the Affidavit of Leon Neal that was filed as part of DaimlerChrysler Corporation's Opposition to Plaintiffs' Motion to Compel. Mr. Neal's affidavit explains the differences between the open body structure of the Jeep Wrangler (YJ) and Jeep Wrangler (TJ). Those differences are not minor, as claimed by Plaintiffs without expert support. In an attempt to bolster Plaintiffs' conclusory claims that the differences are minor, they attach deposition testimony of Peter Chapman, a DaimlerChrysler Corporation engineer who worked on the body-in-white structure of the Jeep Wrangler (TJ), but who had no involvement in the design of the Jeep Wrangler (YJ). Plaintiffs point to Mr. Chapman's testimony that "the main hoop of the sport bar was formerly a two-piece, became a three-piece [in the Jeep Wrangler (TJ)]." Mr. Chapman, who was not involved in the design of the Jeep Wrangler (YJ), was mistaken in this testimony. According to the Affidavit of Leon Neal, who was involved with the design and development of the Jeep Wrangler (YJ), the main hoop and rear braces of the roll bar of the Jeep Wrangler (YJ) consisted of one fabricated piece. Leon Neal Affidavit, Exhibit A, ¶6(a).

-3-

While Mr. Chapman may have initially characterized the differences in the open body structures as "minor," his later testimony is at odds with that characterization. He testified at some length that the roll bar attachment points of the Jeep Wrangler (YJ) and Jeep Wrangler (TJ) differed. Chapman Deposition, Exhibit B, pp. 16-18. Mr. Chapman testified that the roll bar of the Jeep Wrangler (TJ) had an attachment at the B-pillar, which the Jeep Wrangler (YJ) did not. Chapman Deposition, Exhibit B, p. 17. Mr. Chapman characterized this change as a "major change." Chapman Deposition, Exhibit B, p. 38. Mr. Chapman's testimony comports with Mr. Neal's Affidavit, which states that the "main hoop of the roll bar on the Jeep Wrangler (YJ) is attached to the floor pan" while the "main hoop of the roll bar on the Jeep Wrangler (TJ) is attached to the floor pan and body side panel." Leon Neal Affidavit, Exhibit A, ¶6(b).

Mr. Chapman was not questioned about the rear braces of the roll bar or the side bars of the roll bar, all of which are part of the open body structure. Mr. Neal delineated differences in the attachment points of these components. Leon Neal Affidavit, Exhibit A ¶6(c) and (d). These differences are not addressed in Plaintiffs' brief or exhibits thereto.

In order to trivialize the differences between the vehicles, Plaintiffs selectively cite Mr. Chapman's testimony that changes in the attachment points for the roll bar of the Jeep Wrangler (TJ) were intended to help with wind noise and water leak issues. Chapman Deposition, Exhibit B, pp. 17-18. There were other reasons for the changes in the design of the roll bar used on the Jeep Wrangler (TJ), including allowing for the adjustment of the roll bar during the assembly process to accommodate individual tolerances in the body structure of the vehicle. Affidavit of Leon Neal, Exhibit A, ¶6(a). Most importantly, however, changes in the roll bar structure for the Jeep Wrangler (TJ) for whatever reason, contradict Plaintiffs' argument that the roll bar of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) were the same.

The differences in the design configuration and the attachment methods and locations make the upper body structure of the Jeep Wrangler (TJ) different from the Jeep Wrangler (YJ). Leon Neal Affidavit, Exhibit A, ¶7. Mr. Chapman's testimony supports this position, notwithstanding his initial inaccurate characterization of the changes as minor. Plaintiffs have offered no evidence, by an expert or otherwise, to support their claim that the open body structures of the vehicles are the same.

### C. Documents Related to the Jeep Wrangler (TJ) Are Neither Relevant Nor Reasonably Calculated to Lead to the Discovery of Admissible Evidence.

Plaintiffs claim that documents related to the design of the Jeep Wrangler (TJ) are relevant or reasonably calculated to lead to the discovery of admissible evidence. In so claiming, Plaintiffs state that there was a design process underway in 1993 "to revise and improve the Jeep Wrangler (YJ) into the Jeep Wrangler (TJ)." (Plaintiffs' Brief, p. 6) This statement is false. The Jeep Wrangler (TJ) is not a Jeep Wrangler (YJ). The Jeep Wrangler (TJ) is an all-new vehicle with a different open body structure from the Jeep Wrangler (YJ). To characterize them as the same vehicle is misleading.

Plaintiffs state the documents related to the Jeep Wrangler (TJ) may show "possible design alternatives that could have been implemented prior to the manufacture of Chris Phelan's Jeep Wrangler (YJ)." (Plaintiffs' Brief, pp. 6-7) Plaintiffs' implication that the open body structure of the Jeep Wrangler (TJ) was an alternative design flies in the face of their claim that the open body structures of the two vehicles were the same.

Plaintiffs further contend that Jeep Wrangler (TJ) documents are somehow relevant to the question of whether DaimlerChrysler Corporation should have sent product warnings or recall notices to Jeep Wrangler (YJ) owners. It is difficult to fathom how information about Jeep

-5-

Wrangler (TJ) design, testing, and lawsuits, could be deemed to necessitate warnings or recall notices as to the Jeep Wrangler (YJ). Plaintiffs offer no explanation for this nonsensical claim.

While it is true that relevance in discovery is broader than that required for admissibility at trial, the object of inquiry must have some evidentiary value before an order to compel discovery of otherwise inadmissible material will issue. Bottaro v. Hatton Assoc., 96 F.R.D. 158, 159 (E.D.N.Y. 1982). Piacenti v. General Motors Corporation and Suzuki Motor Company, Ltd., 173 F.R.D. 221 (N.D. Il. 1997) involved a product liability action against the manufacturer of the Geo Tracker, which was alleged to be defective due to its propensity to spin out of control and its lack of directional stability. Plaintiff sought extensive design and test information concerning another sport utility vehicle, the Suzuki Samurai. The Court ruled that the plaintiff could not obtain discovery of Suzuki Samurai information because the plaintiff failed to establish that the two vehicles were substantially similar and, as such, discovery related to the Suzuki Samurai "has little evidentiary value to the issue of whether the Tracker is defective." 173 F.R.D. at 224. See also, Uitts v. General Motors Corporation, 62 F.R.D. 560 (E.D.Pa. 1974) (in action where defect was alleged in vehicle's engine mount and accident vehicle was the subject of an engine mount recall, plaintiff could not obtain information about another vehicle that was not subject to the same recall); Hofer v. Mack Trucks, Inc., 981 F.2d 377 (8th Cir. 1993) (discovery regarding earlier model trucks disallowed where there was no showing of substantially similarity between the accident vehicle and the prior model trucks).

In Culligan v. Yamaha Motor Corporation USA, 110 F.R.D. 122, 124 (S.D.N.Y. 1986), the Court held that information about post-manufacture testing of other all-terrain vehicle models was relevant for discovery purposes *absent a showing of any pertinent differences between the model involved in the accident and other models.* DaimlerChrysler Corporation, through the affidavit of Leon Neal, has clearly presented evidence of the differences between the Jeep Wrangler (YJ) and

-6-

the Jeep Wrangler (TJ), particularly with reference to the components at issue in this lawsuit. On the other hand, despite the Court's July 10 order that the renewed motion be supported by an expert affidavit, Plaintiffs have not produced evidence that the Jeep Wrangler (YJ) and Jeep Wrangler (TJ) are substantially similar. Since Plaintiffs have not presented an expert affidavit that establishes similarity between the vehicles, and indeed the evidence in the record is to the contrary, the court must find that the desired discovery would not be relevant or lead to the discovery of admissible evidence. Uitts v. General Motors Corporation, supra, 62 F.R.D. at 562.

DaimlerChrysler Corporation has provided extensive design and testing information for all model years of the Jeep Wrangler (YJ). It should not be compelled to expend significant effort and expense to search for information about the Jeep Wrangler (TJ) since such information is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

### D. Jeep Wrangler (TJ) Documents Have No Relevance to the FMVSS 216 Testing Conducted on the Jeep Wrangler (YJ).

The Jeep Wrangler (YJ), as an open-bodied vehicle, was not subject to Federal Motor Vehicle Safety Standard (FMVSS) 216 -- Roof Crush Resistance. A test of the Jeep Wrangler (YJ) using FMVSS 216 as a guideline was conducted in 1994 and a one-page document was produced in connection with that test.[2] The last paragraph of Plaintiffs' brief all but claims that DaimlerChrysler Corporation fabricated a test document related to the Jeep Wrangler (YJ). Plaintiffs disingenuously claim that Jeep Wrangler (TJ) documents will establish whether the "roof crush test every (sic) occurred." (Plaintiffs' Brief, p. 7) This false and outrageous claim is not grounds for discovery of Jeep Wrangler (TJ) documents.

---

[2]. During the development of the open body structure used on the 1992 through 1995 Jeep Wrangler (YJ), testing was conducted using FMVSS 216 as a guideline. Documents related to this testing were also produced.

-7-

In support of the contention that this roof crush test never occurred, Plaintiffs claim that the document "lacks the usual and necessary validation." (Plaintiffs' Brief, p. 7) FMVSS 216 was not applicable to the Jeep Wrangler (YJ) and, as such, DaimlerChrysler Corporation was not required to provide compliance documentation to the National Highway Traffic Safety Administration. Plaintiffs further claim that the document was found as part of a "second search effort." (Plaintiffs' Brief, p. 7) In connection with other unrelated litigation, the document was produced as part of a supplemental response to discovery. In this case, the document was produced, pursuant to protective order, in its initial response to Interrogatory No. 5 shortly after the responses were served on Plaintiffs.

Plaintiffs are attempting to trump up a false allegation of document fabrication as a basis for obtaining Jeep Wrangler (TJ) documents. This unethical behavior should not be tolerated by the Court and the renewed motion should be denied.

### III. CONCLUSION

For the foregoing reasons, it is respectfully submitted that Plaintiffs' Renewed Motion to Compel be denied with prejudice.

Respectfully Submitted,

_/s/ James P. Kerr_
James P. Kerr (Fed. Bar ID# CT24142)
CORNELL & GOLLUB
75 Federal Street
Boston, Massachusetts 02110
(617) 482-8100
(617) 482-3917 (facsimile)

MILLER, CANFIELD, PADDOCK & STONE, PLC
840 West Long Lake Road, Suite 200
Troy, Michigan 48098
(248) 879-2000

Attorneys for Defendant,
DaimlerChrysler Corporation

## CERTIFICATE OF SERVICE

  I, James P. Kerr, attorney for defendant DaimlerChrysler Corporation, hereby certify that on this ___ day of November, 2003, a true and correct copy of the foregoing Defendant DaimlerChrysler Corporation's Opposition to Plaintiff's Renewed Motion to Compel was served via first-class mail, postage prepaid, directed to:

Steven E. Arnold, Esq.
Peter Van Dyke, Esq/
STANGER & ARNOLD, LLP
29 South Main Street, Suite 325
West Hartford, Connecticut 06107
Attorney for Plaintiff

Mr. Christopher Miller
Robinson Correctional Facility
285 Shaker Road
P.O. Box 1400
Enfield, CT 06082
Third-Party Defendant, *pro se*

Daniel J. Krisch, Esq.
Horton, Shields & Cormier
90 Gillett Street
Hartford, Connecticut 06105
Co-counsel for Defendant

Terri S. Reiskin, Esq.
James A. Hourihan, Esq.
Hogan & Hartson, LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Co-counsel for Defendant

Lewis H. Goldfarb, Esq.
Hogan & Hartson, LLP
875 Third Avenue
New York, New York 10022
Co-counsel for Defendant

_____
James P. Kerr

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

IN RE JEEP WRANGLER CLASS ACTION

CIVIL NO. 3:02 CV 1219 JBA

ANGELA PHELAN, ADMINISTRATRIX OF THE ESTATE OF CHRISTOPHER PHELAN, CLASS MEMBER, AND INDIVIDUALLY

    Plaintiffs

VS.

DAIMLERCHRYSLER CORPORATION

    Defendant

## AFFIDAVIT OF LEON W. NEAL

STATE OF MICHIGAN  )
                             ) ss
COUNTY OF OAKLAND )

Leon W. Neal, being duly sworn, states:

1. I am over the age of eighteen and am competent to give this affidavit. I have personal knowledge of the facts and circumstances set forth herein, and they are true and correct.

2. I am employed as a Product Analysis Senior Specialist for DaimlerChrysler Corporation, formerly known as Chrysler Corporation. Prior to that, I was employed as a Vehicle Development Engineer for American Motors Corporation and Chrysler Corporation. I have been an automotive engineer for seventeen years and have been in my present position for more than nineteen years. I was involved in the design and development of the Jeep Wrangler

(YJ) vehicle. I am familiar with the design of the upper body structure of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ).

3. I understand that this lawsuit involves an accident involving a 1994 Jeep Wrangler (YJ), which was struck from behind at high speed by a Ford Taurus, left the roadway as a result of the collision and overturned. I further understand that Plaintiff has alleged that the upper body structure of the Jeep Wrangler (YJ), including the roll bar, was defective because it did not protect Plaintiff from injury during the accident.

4. I have been informed that Plaintiff is seeking documents and information about the upper body structure of the Jeep Wrangler (TJ).

5. The Jeep Wrangler (YJ) was produced during the 1987 through 1995 model years. Production of the Jeep Wrangler (YJ) was discontinued in 1996. The Jeep Wrangler (TJ) was produced beginning in the 1997 model year and continues in production today. Although both vehicles are open-bodied vehicles that have an upper-body structure that incorporates a roll bar and supporting structure, the design configuration and attachment of the upper-body structures of the two vehicles are different.

6. Specific differences in the body structure of the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) include the following:

    a. The main hoop and rear braces of the roll bar on the Jeep Wrangler (YJ) consist of one fabricated piece. The main hoop and rear braces of the roll bar on the Jeep Wrangler (TJ) consist of three slotted sections that are connected together during assembly of the vehicles. The reasons for this

-2-

    difference are to increase shipping and part storage efficiencies for the roll bar used on the Jeep Wrangler (TJ) and to allow for adjustment of the roll bar during the assembly process to accommodate individual tolerances in the body structure of the vehicle.

b.  The main hoop of the roll bar on the Jeep Wrangler (YJ) is attached to the floor pan of the vehicle. The main hoop of the roll bar on the Jeep Wrangler (TJ) is attached to the floor pan and the body side panel. In addition, the design of the floor pan used in the Jeep Wrangler (TJ) is different than the floor pan used in the Jeep Wrangler (YJ).

c.  The attachment points for the rear braces of the roll bar on the Jeep Wrangler (TJ) are located further outboard on the vehicle body, closer to the body side panels than the attachment points of the rear braces of the roll bar on the Jeep Wrangler (YJ).

d.  The side bars, which attach the main hoop of the roll bar to the windshield, are attached to the roll bar on the Jeep Wrangler (YJ) by a "through bolt" that runs through the roll bar and into the side bars. The side bars on the Jeep Wrangler (TJ) are attached to the roll bar by two bolts that attach to the front face of the roll bar.

7.    The combination of all of these differences in both the design configuration and the attachment methods and locations make the upper body structure of the Jeep Wrangler (TJ) different than the upper body structure of the Jeep Wrangler (YJ). However, both structures are reasonably strong and provide some protection to occupants in accidents.

_____
Leon W. Neal

Subscribed and sworn to before me
this ___ day of June, 2003.

_____
Notary Public
PAMELA JOYCE WALTON
Notary Public, Oakland County, Michigan
My Commission Expires March 20, 2005

77316.1\105030-01537
06/04/03

-4-

```
 1              IN THE CIRCUIT COURT OF TENNESSEE
 2       FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
 3
 4   JAMES W. GILLESPIE and SANDRA
 5   GILLESPIE, Parents and Next
 6   of Kin of JAMES WADE GILLESPIE,
 7   Deceased,
 8
 9                   Plaintiffs,
10
11       vs                        Case No. 76600-9
12
13   DAIMLERCHRYSLER CORPORATION
14   and JEEP EAGLE, Division of
15   the Chrysler Corporation,
16
17                   Defendants.
18                                     /
19   DEPONENT:    PETER CHAPMAN
20   DATE:        Monday, October 30, 2000
21   TIME:        9:50 a.m.
22   LOCATION:    840 West Long Lake Road, Suite 200
23                Troy, Michigan
24   REPORTER:    Denise M. Kizy, RPR/CSR-2466
25   VIDEO:       Tim Reitman and James Walker
```

1

```
1    APPEARANCES:

2

3         WOLFF ARDIS, P.C.

4         By:  Mr. Daniel K. Evans

5         6055 Primacy Parkway, Suite 360

6         Memphis, Tennessee 38119-5776

7         (901) 763-3336

8              Appearing on behalf of the Plaintiffs

9

10        MILLER, CANFIELD, PADDOCK & STONE

11        By:  Mr. Stephen J. Ott

12        840 West Long Lake Road, Suite 200

13        Troy, Michigan 48098

14        (248) 879-2000

15             Appearing on behalf of the Defendants

16

17

18

19

20

21

22

23

24

25
```

2

```
 1                What standards were those?
 2       A.    They are set up for each vehicle.
 3       Q.    Are you simply referring to the
 4  specifications for the vehicle?
 5       A.    That a team would set at the start of the
 6  program, yes.
 7       Q.    Are there quality standards that have to
 8  be met with each vehicle that are company wide or
 9  vehicle wide?
10       A.    I don't know if you can clarify that any
11  more.
12       Q.    Does Chrysler have any standards for which
13  all of their vehicles must meet?
14       A.    Yes, they do.
15       Q.    What are those standards referred to?
16       A.    There are fairly wide-reaching standards.
17  They take into account fit, finish, performance.
18       Q.    Is there a name for those standards?
19       A.    Not that I know of.
20       Q.    And you also mentioned that the TJ model
21  differed from the YJ model with regard to the sport
22  bar in attachment points?
23       A.    Yes.
24       Q.    Why were those changes made?
25       A.    To try and improve the dimensional quality
```

1   of the vehicle and to try and improve its torsional
2   and dynamic bending properties.
3       Q.   I believe you said that there was an
4   attachment point at the B-pillar in the TJ?
5       A.   Yes, there was.
6       Q.   And there was not one on the YJ?
7       A.   Not to the upper B-pillar.
8       Q.   How else did the attachment points change
9   between the TJ and the YJ?
10      A.   The attachments at the lower B-pillar I
11  think were turned through 90 degrees.  Basically I
12  think the rest of them were fairly similar.
13      Q.   Did you say turned to 90 degrees?
14      A.   Through 90 degrees.
15      Q.   Through 90 degrees?
16      A.   Yeah.
17      Q.   And I believe you said that there were two
18  reasons for the attachment points changes; one was
19  the dimensional control and that's the same
20  dimensional control that we just talked about?
21      A.   Yes, it was.
22      Q.   And so that changing the attachments
23  points helped with the wind noise and water leak
24  problems?
25      A.   Yes.

1    Q.    And then you also said that one of the
2    other reasons for the change in the attachment
3    points was to increase the strength in torque and
4    bending?
5    A.    Torsional and bending, yes.
6    Q.    What was wrong with the YJ with regard to
7    its strength in torsional and bending?
8            MR. OTT:  Object to form.
9            THE WITNESS:  I hesitate to use the
10   term what was wrong with it, but by improving both
11   of those properties we can make a vehicle sound and
12   feel a lot tighter.
13   Q.    (BY MR. EVANS) Was this a problem solely
14   related to wind noise and water leaks?
15   A.    And we would also put down BSR, which is
16   buzz, squeak and rattle.
17   Q.    Did the change in the attachment points
18   increase the strength of the vehicle or the -- let
19   me rephrase that question.
20           Did the change in the attachment
21   points increase the strength of the sport bar?
22   A.    You'd have to ask our structures group
23   that question.
24   Q.    And who would I ask in the structures
25   group?

```
 1    body stiffness?
 2         A.   Major change was to make the additional
 3    attachment to the top of the B-pillar.
 4         Q.   So that was the improve the overall body
 5    stiffness, that was another reason for that; it
 6    wasn't simply wind noise and water leaks and the
 7    buzz, squeak and rattle that we talked about
 8    earlier?
 9         A.   You're back to the torsional and dynamic
10    bending, yes.
11         Q.   I understood you to tell me that that was
12    related to buzz, squeak and rattle?
13         A.   That has an effect on buzz, squeak and
14    rattle.
15         Q.   So another reason is not simply a consumer
16    complaint about buzz, squeak and rattle, wind noise
17    and water leaks, but was to increase the overall
18    stiffness of the vehicle?
19         A.   That's why I made the statement earlier,
20    was to improve or to achieve torsional and bending
21    targets, yes.
22         Q.   Now how did your design improve the
23    overall stiffness of the vehicle?
24         A.   By adding an extra attachment point at the
25    top of the B-pillar we were able to run tests,
```