UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE JEEP WRANGLER CLASS ACTION | : | CIVIL NO. 3:02 CV 1219 (JBA) |
| | : | |
| ANGELA PHELAN, ADMINISTRATRIX OF | : | |
| THE ESTATE OF CHRIS PHELAN,        : | | |
| CLASS MEMBER, AND INDIVIDUALLY | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| VS. | : | |
| | : | |
| DAIMLERCHRYSLER CORPORATION | : | MARCH 5, 2004 |
| | : | |
| Defendant | : | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
ON COUNT I OF PLAINTIFFS' AMENDED COMPLAINT**

Plaintiffs oppose Defendant's Motion For Summary Judgment On Count I Of Plaintiffs'

Amended Complaint for the following reasons and authorities.

## I.    NATURE OF CASE

The Chris Phelan estate brings this Connecticut Unfair Trade Practices Act (CUTPA)

action to recover economic and punitive damages from Defendant, on behalf of the estate and the

putative class of Connecticut Jeep Wrangler sport utility vehicle (SUV) owners and lessees.  The

Phelan estate also brings this product liability action to recover compensatory and punitive

1

damages from Defendant for Chris Phelan's wrongful death that was caused by the Jeep Wrangler's latent and unreasonably dangerous roll cage design defects that failed to provide Chris Phelan with any adequate rollover safety protection.  Defendant moves for summary judgment as to the Phelan estate's CUTPA claims on statute-of-limitations grounds.  Plaintiffs oppose Defendant's summary judgment motion on the basis that the Phelan estate did timely commence their CUTPA action against Defendant.  Plaintiffs further maintain that Defendant's continuing course of fraudulent and concealing wrongful conduct also tolled the running of the statute of limitations for the Phelan estate's CUTPA action against Defendant until at least January 18, 2000, the date of Chris Phelan's fatal Jeep Wrangler rollover accident.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "'A District Court must resolve any factual issues of controversy in favor of the non-moving party,' mindful that 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Omega S.A. v. Omega Engineering, Inc., 228 F.Supp.2d 112, 118 (D. Conn. 2002 (JBA))(internal citations omitted).  "An issue of fact is

2

'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" Id.  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id.  "Accordingly, summary judgment may [only] be granted '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Id.

## III.    ARGUMENT

**The Phelan Estate's CUTPA Action Was Timely Commenced,**
**Thus The Phelan Estate Has Standing To Be A Proper Class Representative**

The Court's September 26, 2003 Order ("September Order") directed the parties to "focus … on [the] critical issue of whether the alleged CUTPA violations regarding Phelan's 1994 Jeep Wrangler occurred prior to July 17, 1999," and "to conduct … discovery on … 1. Plaintiff's individual CUTPA claim; and 2. Plaintiff's ability to serve as putative class representative," because of a possible statute of limitations bar.  (Dkt. #81, p. 1, 4.)  The Court's September Order further noted that, "When the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed.  Here, the 'wrong sued upon' in count one of Phelan's amended complaint is the fraudulently induced overpayment for an automobile, which conduct is complete upon the vendor's receipt of payment …." (Dkt. #81, n.1).

Plaintiffs timely commenced this CUTPA action on July 16, 2002, thus making the Phelan

**STANGER & ARNOLD, LLP**
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

estate a proper class representative.  Plaintiffs' CUTPA action seeks damages for the economic

losses Plaintiffs sustained by their overpayment for their Jeep Wranglers, that Defendant designs

to look rollover safe, and that Defendant markets and misrepresents to consumers, including to

Chris Phelan, to be rollover safe, when in fact Defendant does not design the Jeep Wrangler with

any adequate rollover safety protection for its occupants.  Plaintiffs' economic losses include the

loss of the benefit of their bargain for Jeep Wranglers that did provide adequate rollover safety

protection, the resultant loss in market value of their Jeep Wranglers, and the loss of use of the

money they overpaid for their Jeep Wranglers because they are not rollover safe (Plaintiffs'

"economic losses").

      Therefore, Defendant's summary judgment motion as to the Phelan estate's CUTPA

claims must fail.  Furthermore, Plaintiffs maintain that Defendant's continuing course of

wrongful and fraudulently concealing conduct regarding the Jeep Wrangler roll cage tolled the

running of the statute of limitations for Chris Phelan estate's CUTPA action against Defendant

until at least January 18, 2000, the date of Chris Phelan's fatal Jeep Wrangler rollover accident.

    A.      **Chris Phelan's CUTPA Action Did Not Accrue**
               **Until He Overpaid For His Jeep Wrangler**

      The earliest date the statute of limitations for the Phelan estate's CUTPA action may have

commenced running is July 19,1999, the date when Chris Phelan, through his lender,

NationsBank, honored and paid the letter of credit to the car dealer, Gallagher Buick

**STANGER & ARNOLD,** LLP

29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

("Gallagher"), to complete the purchase of Chris Phelan's Jeep Wrangler.  Plaintiffs' CUTPA

action was commenced on July 16, 2002, when Plaintiffs filed their lawsuit papers with the Court

and delivered them to a process server for service upon Defendant.  Plaintiffs' CUTPA action was

commenced within the applicable three-year statute of limitations from the date when

Defendant's CUTPA violations caused Chris Phelan to overpay for his Jeep Wrangler and sustain

his economic losses.  Accordingly, Defendant's summary judgment motion as to Plaintiffs'

CUTPA action must be denied.  Moreover, CGS 42a-2-608 allowed Chris Phelan a reasonable

period of time after July 19, 1999 to revoke his acceptance after discovering that his Jeep

Wrangler was a non-conforming good.  As discussed below in Section  III.B., Defendant's

CUTPA violations that fraudulently induced Chris Phelan to purchase his Jeep Wrangler occurred

prior to, on, and continued after July 17, 1999.

       1.    **Chris Phelan Overpaid For His Jeep Wrangler When The Letter Of Credit Was Honored And Paid By NationsBank**

Chris Phelan purchased his Jeep Wrangler with a letter of credit issued by NationsBank to

Gallagher.  **Exh. 1** (NationsBank July 1, 1999 Correspondence); **Exh. 2** (Approval Package);

**Exh. 3** (Documentary Draft with checklist). Chris Phelan's overpayment for his Jeep Wrangler

occurred on July 19, 1999, when NationsBank honored and paid the letter of credit to Gallagher

after Gallagher's documentary presentation as per its terms.  **Exh. 4** (E-Loan documents/

description of 7/19 document presentment/payment).  Therefore, the Phelan estate's CUTPA

5

action did not accrue until July 19, 1999, and its action was timely commenced on July 16, 2002

before the CUTPA three-year statute of limitations may have expired.

> In a letter of credit situation, there are ordinarily three separate and distinct contracts involved: (1) the contract between a bank and its customer (usually the buyer) whereby the bank agrees to issue the letter of credit to the beneficiary (usually the seller); (2) the contract of sale between the buyer and the seller whereby, among other things, the seller agrees to obtain payment under the letter of credit by drawing drafts there under and presenting them to the bank accompanied by documents specified by the buyer; and (3) the letter of credit itself, which is a contract between the bank and the beneficiary (usually the seller) whereby the bank agrees to pay the drafts drawn under the letter of credit and presented to it by the beneficiary if they are accompanied by the requisite documents.

Data General Corp., Inc. v. Citizens National Bank of Fairfield, 502 F.Supp. 776, 780 (D. Conn.

1980).  "A letter of credit is a definite undertaking that satisfies the requirements of 42a-5-104 by

an issuer to a beneficiary at the request or for the account of an applicant … to honor a

documentary presentation …."  CGS §42a-5-102(a)(10).  "A letter of credit … may be issued in

any form that is a record and is authenticated (i) by a signature, or (ii) in accordance by agreement

of the parties …." CGS §42a-5-104.  "For Example, a letter of credit will typically specify the

amount available, the expiration date, the place where presentation should be made, and the

documents that must be presented to entitle a person to honor." Id., Comment 1.

NationsBank's letter of credit to Gallagher is not a check within the meaning of CGS §42a-3-

104(f), as Defendant incorrectly contends, which defines a check to be a "draft, other than a

6

documentary draft, payable on demand." (emphasis added).  An issuing bank will not honor a

demand for payment of a letter of credit unless the documentary presentation by the

seller/beneficiary is in order.  Data General, 502 F.Supp. at 780.  An issuing bank will examine

the documentary presentation and determine whether to take up or refuse to honor payment

within seven banking days of the presentation.  Uniform Customs & Practice for Documentary

Credits, Art. 13(b).

Gallagher was not entitled to payment under the letter of credit until NationsBank

approved the documentary presentation as required by the dealer checklist and documentary draft.

Gallagher had to provide the year, make, model, VIN number of Chris Phelan's Jeep Wrangler,

state whether it was new or used, present a loan-to-value calculation, bill of sale, buyer's driver's

license, proof of insurance and income, and completed lien perfection. **Exh.** 3.  NationsBank

reviewed Gallagher Buick's documentary presentation and then "funded the loan" on July 19,

1999.  **Exh. 4**.  Therefore, the Phelan estate's CUTPA action was timely commenced on July 16,

2002, and Defendant's summary judgment motion must be denied.

> **2.**     **Title To Chris Phelan's Jeep Wrangler Also Did Not Transfer Until
> The Letter Of Credit Was Honored And Paid To Gallagher Buick**

Title to the Jeep Wrangler also did not pass from Gallagher to Chris Phelan until the letter

of credit with the required documents, including a completed title lien perfection, were presented

to NationsBank. **Exh. 4**.  "Letters of credit commonly are used to facilitate commercial

7

transactions between reluctant sellers and buyers, both of whom hesitate to initiate the exchange of money for goods." Data General, 502 F.Supp. at 780.  Custom and usage allows parties to a letter of credit to dictate when title transfers away from the seller.  Goodpasture, Inc. M/V Pollux, 602 F.2d 84, 85 (5th Cir. 1979).  In Goodpasture, the court analyzed when title to goods passed where a letter of credit is silent on that issue, finding that "[u]nder a further trade custom and usage, title to such grain does not pass until payment is made.  Both Goodpasture and Empac were aware of this custom and usage in the grain trade, and each negotiated this contract pursuant to that custom and usage, which forms a part of and is a term of the contract between the parties. Both parties, therefore, understood that title to grain was not to pass from Goodpasture to Empac until payment was made under the Idema-Empac letter of credit." Id. at 85.  Only after Gallagher provided the completed title lien perfection to NationsBank, and NationsBank accepted Gallagher's documentary presentation, and honored and paid on the letter of credit on July 19, 1999, did title to the Jeep Wrangler transfer from Gallagher to Chris Phelan.

    B.    **Defendant's Fraudulent Concealment and Continuing Course Of Conduct Tolled The Statue Of Limitations Until On Or After The Date Of Chris Phelan's Fatal Rollover Accident**

The Phelan estate timely commenced this CUTPA action.  Nonetheless, Plaintiffs still maintain that the CUTPA statute of limitations was and remains tolled, until at least the January 18, 2000 date of Chris Phelan's fatal rollover action, because of Defendant's continuing course of

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

fraudulent and concealing CUTPA conduct.  Only then did Chris Phelan's estate discover that he

overpaid for his Jeep Wrangler, because it was not rollover safe as Defendant made it appear and

misrepresented it to be, and which ultimately caused Chris Phelan's death and CUTPA economic

losses.

### 1.    Defendant's Fraudulent Concealment

To toll the statue of limitation under the "fraudulent concealment" doctrine, Plaintiffs

must prove that Defendant "[was] aware of the facts necessary to establish the cause of action[,]

… intentionally concealed them from [Plaintiffs] for the purpose of obtaining delay in filing a

complaint", and the concealment must have occurred within three years of the filing of the action.

Izarrelli v. R.J. Reynolds Tobacco Co., 117 F.Supp.2d, 167, 177 (D. Conn. 2000)(internal

citations omitted).

In Izzarelli, the court held that "[the plaintiff] ha[d] alleged that since 1994, Reynolds

fraudulently concealed its illegal youth marketing practices and made false denials that were

designed to conceal the true state of facts.  Accordingly, the elements of the fraudulent

concealment statute have been met."  Id.  Plaintiffs in this case allege that Defendant intentionally

and deceptively manipulated the design of its Jeep Wrangler to look like it has adequate rollover

protection, which it does not, to induce consumers, including Chris Phelan, to purchase Jeep

Wranglers at an inflated price.  (Dkt. #18, at ¶¶ 7-10, 18-23); see also Plaintiffs' August 15, 2003

Motion for Extension of Time To Complete Product Discovery and Plaintiffs' January 12, 2004 Opposition to Defendant's Motion for Protective Order.  Defendant then knowingly and intentionally engaged in a continuous, deceptive marketing scheme to conceal from Chris Phelan, and other Jeep Wrangler owners and lessees, the lack of any adequate Jeep Wrangler rollover protection, so that they would not discover or seek to recover for the economic losses they sustained by Defendant's CUTPA conduct.  Id.  Defendant also has and continues to systematically defend, suppress, obstruct and then settle many other Jeep Wrangler rollover claims and lawsuits, utilizing confidential protective orders, bad faith discovery practices, and confidential settlement agreements to conceal from Plaintiffs, and the public, that the Jeep Wrangler lacks any adequate rollover safety protection.  Id.

The Court's September Order states that "[a]s a basis for tolling under the doctrine of fraudulent concealment, Phelan merely reasserts the allegedly long-running fraudulent scheme [Defendant] has allegedly perpetrated on unaware consumers.  The fundamental problem with this argument is that it alleges the same conduct as both CUTPA violations and the fraudulent concealment of the CUTPA violations."  (Dkt. #81, 3-4).  Plaintiffs maintain that Defendant's wrongful CUTPA violations include Defendant's intentional manipulation of the Jeep Wrangler roll cage design, to make it appear that it is rollover safe, when it is not.  Plaintiffs further maintain that Defendant's separate CUTPA conduct through its Jeep Wrangler marketing, sales,

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

and lawsuit prevention efforts constitutes Defendant's continuing fraudulent and concealing wrongful CUTPA conduct that tolls the statute of limitations in all cases.

Defendant's continuing acts of "fraudulent concealment" include Defendant's Jeep Wrangler roll cage deceptive marketing scheme, withholding of relevant information from the National Highway Safety Transportation Administration ("NHTSA"), and deceptive litigation practices designed to intentionally conceal from Plaintiffs, and the public, that the Jeep Wrangler's sales price was inflated because it provided no adequate rollover safety protection for its occupants.  Plaintiffs opposition papers demonstrate that, at a minimum, there are issues of material fact in dispute that require Defendant's summary judgment motion to be denied.

Defendant concealed its Jeep Wrangler rollover and roof crush testing from NHTSA and the public. **Exh. 5** (Defendant's 3-6-81 Side Bar testing); **Exh. 6** (12-14-82 Full Roll Cage testing); **Exh. 7** (Defendant's 3-5-90 letter to NHTSA stating that Jeep Wrangler is a open-body, convertible vehicle that does not require testing)(which would reveal its roll cage system defects); **Exh. 8** (Defendant's12-3-01 letter to NHTSA stating that there is no causal relationship between roof crush and serious occupant injury).  Nevertheless, Defendant then misrepresented to NHTSA that "the various tests that have been conducted indicate that the load carrying performance of the roll bar on this vehicle is equivalent to that specified by FMVSS 216." **Exh. 9** (1-19-89 Safety Committee Minutes); **Exh. 10** (2-2-89 Memo and Letter to NHTSA).

**STANGER & ARNOLD,** LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

a.    **Defendant Knew That The Jeep Wrangler Roll Cage Design Was Not Rollover Safe**

It is indisputable that Defendant had actual knowledge of the facts necessary to establish Plaintiffs' cause of action. **Exh. 11** (One memo recognizing liability, while second demands rugged appearance).  After years of defending Jeep CJ rollover lawsuits (the precursor to the Jeep Wrangler), Defendant deceptively manipulated the design of the Jeep Wrangler to look like it had a full roll cage because consumer feedback indicated that a full roll cage design was perceived as "safe."  **Exhs. 12-14** (Marketing Research from customer clinic showing Full Roll Cage was a best liked feature as a safety item); **Exh. 15**, at 96 (Gillespie Thornton Testimony).  Moreover, Defendant questioned whether it could get consumers to purchase the vehicle without upgrading its safety image, upper structure reinforcements. **Exh. 16** (Excerpts from 7-28-82 CJ Forward Plans).  However, instead of incorporating a full roll cage (which Defendant had designed and tested), it opted merely to add side bars that gave the Jeep Wrangler the appearance that it had a full roll cage.  **Exhs. 17, 18** (Full Roll Cage shown in customer clinic shares the same design as the Jeep Wrangler, that does not have a Full Roll Cage; **Exh. 15**, at 84, 97.  Moreover, Defendant is fully aware that the addition of side bars offered little additional rollover safety protection. **Exh. 5; Exh. 6; Exh. 19** (9-4-69 dynamic testing indicating the windshield is vulnerable to crushing); **Exh. 20** (1-18-67 dynamic testing indicating the head of an occupant would be impacted in a rollover).  Furthermore, a fact finder could reasonably infer that the market value of

12

Defendant's Jeep Wrangler increased based on the erroneous consumer perception that the Jeep

Wrangler provided adequate rollover safety protection.[1]

> **b.      Defendant's Jeep Wrangler Design And Claims
> History Also Establish Defendant Knows It Is Not
> Rollover Safe**

Testimony regarding the development history of Defendant's Jeep Wrangler from the Jeep

CJ further illustrates that Defendant had actual knowledge of the facts necessary to establish

Plaintiffs' cause of action.  In the late 1970s, Defendant first attempted to improve the roll bar of

the Jeep CJ5.  **Exh. 21**, at 124 (McNulty Thornton I Deposition).  Claims had been made that the

CJ5 roll bar was not good enough.  Id., at 171.  The goal in developing the CJ7 was to improve

upon the amount of force required to crush the roll bar system from the CJ5.  Id., at 174-175.

Thereafter, the 1979 ½ roll bar was developed to help address complaints surrounding the

perceived defect in the CJ's roll bar.  Id., at 199-200.

> Q:  Before 1985 what was your understanding, if any, of the allegations that were
>
> being made about roll bar failures in either CJ5's or CJ7 vehicles?
>
> A:  That there was too much crushing, that the roll bar did not provide enough
>
> protection.  **Exh. 22**, at 93 (McNulty Thornton II Deposition).

---

[1] As per the Court's September Order, class discovery remains stayed.  However, once the Court orders class discovery to proceed, Plaintiffs will disclose expert witnesses that will testify to the increase in the Jeep Wrangler's market value due to consumer perceptions of rollover safety.

13

In the late 1970s into the early 1980s, Defendant evaluated the idea of replacing the CJ7 with a completely new vehicle. **Exh. 15**, at 46-7. Defendant concluded a new vehicle would be too expensive and decided to save the CJ. Id., at 48. Thus the development of the YJ ensued, "[T]here certainly was consideration as to whether the new vehicle should have a fold-down windshield or not, and there were some people that saw no reason for a fold-down windshield and there were many that said no, the customers want it. In surveys that had been done, it's one of the things that they point to that say they want a new vehicle." Id., at 15. Consumers also wanted a safer vehicle. **Exh. 23**, at 64 (Rogers Thornton Deposition).

In response to lawsuits, Defendant added the side bars to prevent the windshield from entering into the occupant compartment. **Exh. 15**, at 107, 79-80. "Certainly in rollover accidents of some sort, if the [CJ] windshield hit the ground, it would deform since it was not a structural member. And it may go forward, sideways, or rearward. And one of the things that we were looking into was to provide a structure that would reduce its tendency to come into the occupant space, and that's what we did on the Wrangler." Id., at 107. The side bars were designed to prevent the windshield from entering into the occupant compartment and force it to crush to the side, not the rear. **Exh. 21**, at 218. The purpose of the structure forward of the main hoop of the roll bar through the windshield area was to make sure the windshield was less likely to be forced into the occupants' compartment. **Exh. 22**, at 114. "In the Wrangler, what was done was to

14

greatly increase the force required to cause the windshield to be deformed and pushed back towards the people in the car.  The structure, the way it is when it starts to yield and fail, it tends to push sideways." **Exh. 15**, at 85.  Thus, Defendant was completely aware of the design defect present in this case:

> Q:  "And, as an engineer at Chrysler, do you understand that in the event of an accident, including a rollover, an occupant's head may impact with portions of the roof rail?  Side Bar?
>
> A:  That's a possibility, yes." **Exh. 24**, at 83 (<u>Rogers</u> Neal Deposition).

   Meanwhile stronger YJ designs were passed upon, "We also in advanced engineering looked at a lot of different concepts of providing structure forward of the roll bar."  **Exh. 15**, at 14.  "There were many other designs that were considered.  The reason I answer that way – you say rejected – wasn't so much of a rejection but let's look at this, then later let's look at this idea, then, later, let's look at this idea and finally, when we got to the Wrangler, as it was – we were looking at it and designing and developing it, finally people said, yes, let's do this.  The others just didn't develop enough interest to go anywhere." **Exh. 22**, at 113.  The T-Bar design provided more strength forward of the roll bar than a side bar model.  **Exh. 15**, at 23-25.  The T-Bar design was not selected because the Defendant believed consumers would react negatively to its enclosures.  <u>Id.</u>, at 27-28.  The T-Bar design is a roll cage.  <u>Id.</u>, at 86.  "[T]he full roll cage would

**STANGER & ARNOLD, LLP**
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0846
Juris No. 419042

probably cost more, but so much in manufacturing depends upon exactly how you toll it, but I think it would probably be more expensive." Id., at 90.

The side movement created by Defendant is exactly what forced the doorframe to come into contact with Chris Phelan's head in this case. See Ojalvo and Hayes Reports.  In fact, this very side movement of the door frame is clearly depicted in Defendant's own testing.  **Exh. 5**. Defendant only sought to correct part of the CJ problem, i.e., windshield movement to the rear, while exacerbating the side movement problem, which it only addressed using a minor windshield reinforcement, "The windshield was considerably less stiff and strong – the windshield was less strong than the roll bar."  **Exh. 15**, at 32.

> **c.     Defendant's Early Rollover And Roof Crush Testing Further Establish That Defendant Knows The Jeep Wrangler Is Not Rollover Safe**

Defendant's internal rollover and roof crush testing, as well as federal roof crush testing, further demonstrate that Defendant had actual knowledge of the facts necessary to establish Plaintiffs' cause of action.  As early as the 1960's, the safety group conducted a series of tests, No. 1109, on the CJ roll bar in anticipation of a government services administration requirement, 5-15/25, that vehicles it would purchase must pass a certain measure of distance from a particular point on the seat to whatever structure ended up above the seat after a rollover. **Exh. 21**, at 78, 137; **Exh. 22**, at 31.  Mr. Thornton has reviewed documents and videos relating to the 1109 tests.

**STANGER & ARNOLD,** LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

**Exh. 21**, at 142.  If Mr. Thornton wanted to review 1109 materials he would request them from the legal department. Id., at 145.

In 1969, R.F. Penrod, then a Special Equipment Engineer, rolled a CJ down a rock quarry. Id., at 135.  Mr. Penrod recommended changes to the roll bar. Id., at 136.  The Jeep CJ was also subject to a dynamic roll bar test, No. 3246, conducted by the safety group conducted at General Motors Proving Grounds where it was rolled at a speed of 30 miles per hour using FMVSS 208 as a guideline. Id., at 64, 70, 126.  The Jeep was placed on a dolly that travels down a track where it impacts a stop causing the vehicle to be thrown into the air and start rolling. Id., at 90.  Test No. 3246 demonstrated deformation into the occupant compartment. Id., at 94.   Defendant chose not to conduct this test again and turned to FMVSS 216. Id., at 108, 110.  "And we concluded that the test would not be a repeatable test because the vehicle rolled and pitched and bounced, and we did not feel that if you ran two vehicles, one right after another, that they would act the same.  So it wasn't a way of us determining whether we made a better roll bar or not." **Exh. 15**, at 38.  Dynamic testing, however, clearly proves the windshield was problematic in that it was vulnerable and that an occupant's head would be impacted during a rollover **Exh. 19; Exh. 20.**

Defendant's FMVSS 216 roof crush testing procedures circumvented FMVSS 216 testing of the front windshield A-Pillar portion of the roll cage, and only tested the CJ roll bar. **Exh. 23**, at 18-19.  "If you compare the strength and stiffness of the roll bar to the windshield frame and

17

the top structure, the roll bar is much much stronger and stiffer." **Exh. 22**, at 63.  Furthermore,

despite marketing the Jeep Wrangler as a rugged, off-road SUV, Defendant characterized the Jeep

Wrangler to NHTSA as nothing more than a "convertible" and an "open body vehicle" that did

not require federal roof crush testing.  **Exh. 7**.  Nevertheless, in a separate letter to NHTSA,

Defendant also stated that the Jeep Wrangler "is equipped with a roll bar which is designed to

provide some rollover protection," while failing to inform NHTSA or the public that the Jeep

Wrangler is not designed to be rollover safe.  **Exh. 10**.

> **d.    Defendant's Fraudulent Marketing Scheme Concealed From The Public That The Jeep Wrangler Was Not Rollover Safe**

Defendant also intentionally concealed from Plaintiffs and the public that Jeep Wranglers

lack any adequate rollover protection, to prevent, delay, or minimize the discovery and claims for

their resulting economic losses.  Despite its knowledge that the Jeep Wrangler lacked adequate

rollover safety protection, Defendant's advertising and marketing misrepresentations that

occurred since April 1979 through the present were designed and intended to cause consumers to

believe the "single-minded proposition" that all model year Jeep Wranglers are/have:

- "a reputation for toughness, durability and outstanding 4x4 capability";

- "much sturdier than the competition";

- "able to withstand severe punishment"; and

- "Trail Rated."

**Exh. 25** (Defendant's 1990 Marketing Action Plan, including Creative Brief for the Jeep

Wrangler dated 3/9/89); **Exh. 11** (2004 Jeep Wrangler website marketing materials)(emphasis

added).[2]  Furthermore, Defendant directed that the depictions of the Jeep Wrangler in all Jeep

Wrangler advertising and marketing be such that the "roll bar and doors must be on vehicle.  The

windshield must always be in the up position." **Exh. 25** (emphasis added).  Accordingly, since

April 1979, through to the present, it is clear that Defendant's advertising and marketing

misrepresentations have been designed to mislead consumers to believe that all model year Jeep

Wranglers provide adequate rollover safety protection, which they do not, and on which

consumers continued to rely in overpaying for their Jeep Wranglers.  **Exh. 27** (Examples of Jeep

Wrangler print advertising produced by Defendant for model years 1987-1995, and from

Defendant's website for model year 2004).  Had Defendant acted properly, and not continually

misrepresented the rollover safety in Defendant's Jeep Wrangler advertising and marketing, the

market price of Defendant's Jeep Wrangler would have fallen, and existing owners would have

become aware that they had overpaid for their Jeep Wrangler's that looked like, but did not have,

adequate rollover safety protection.

---

[2] Defendant still has failed in its discovery compliance obligations to provide Plaintiffs with Jeep Wrangler Marketing Action Plans or Creative Briefs for any other Jeep Wrangler model years through the present. Accordingly, the Court should infer that Defendant's discovery noncompliance is intended to withhold relevant information regarding Defendant's deceptive marketing scheme.

19

e.    **Defendant's Obstruction Of Justice Attempts To Suppress And Prevent Public Disclosure Of Defendant's Actionable Conduct**

Just as egregious as Defendant's use of a deceptive marketing scheme, Defendant systematically defended and settled numerous Jeep Wrangler rollover lawsuits by using confidential protective orders, bad faith discovery practices, and confidential settlement agreements to intentionally conceal from Plaintiffs the fact that their Jeep Wranglers lacked adequate rollover protection.[3]  Defendant's knowledge of, and involvement with, other Jeep Wrangler rollover litigation, and Defendant's affirmative acts to conceal from Plaintiffs the fact that their Jeep Wrangler's lack adequate rollover protection, occurred within three years of Plaintiffs filing their CUTPA action, and are sufficient for a reasonable fact finder to infer Defendant's specific intent to prevent or delay Plaintiffs' cause of action.  Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 989 F.Supp. 110, 116 (D. Conn. 1997 (JBA)).  In Martinelli, this Court held:

> It is somewhat less clear that the acts of concealment were directed towards delaying or preventing legal action per se.  However, such a specific intent may be reasonably inferred from the Diocese's experience with M.F.'s family and the documents memorializing that experience.  The M.F. incident demonstrated to the Diocese that Father Brett's misconduct could result in psychological harm to the victims, that treatment of such harm might involve

---

[3] See e.g. Plaintiffs' January 12, 2004 Opposition to Defendant's Motion For Protective Order, Section III.A.

20

> hospitalization and professionally therapy, and that victims' parents
> might seek compensation from the Diocese for such treatment.  It is
> but a small step from this knowledge to awareness of potential legal
> liability.

Id.

Accordingly, Defendant's summary judgment motion must be denied because there are genuine

issues of material fact in dispute regarding Plaintiffs' fraudulent concealment tolling argument.

### 2.    Defendant's Continuing Course Of Conduct

To toll the statute of limitations under the "continuing course of conduct" doctrine, there

must either be a special relationship between the parties, or Defendant must have continued to

engage in wrongful conduct related to Defendant's prior conduct at issue in the case.  Fichera v.

Mine Hill Corp., 207 Conn. 204, 209-10 (1988).  The Court's September Order stated that, "The

fundamental flaw in plaintiff's argument is that it conflates [Defendant's] conduct towards

consumers in general as applying to each and every specific consumer.  Plaintiff must be able to

point to conduct towards her which violated CUTPA within CUTPA's statute of limitations."

(Dkt. #81, 2-3).  However, this Court previously has held that wrongful conduct directed towards

the general public, of which a plaintiff is a member, is adequate to toll the statute of limitations

under the continuing course of conduct doctrine.  See e.g. Izarrelli, 117 F.Supp.2d at 177.

Plaintiffs' CUTPA allegations in this case are factually similar to the CUTPA allegations

in Izzarelli.  In Izzarelli, the plaintiff brought a CUTPA action against a cigarette manufacturer,

21

alleging that "Reynold's misrepresentations about the health hazards of smoking and its illegal

youth marketing activities were … intended to affect consumers' decisions to buy tobacco

products and thereby affecting the price of those products.  Reynolds unfairly and deceptively

maintained the price of its tobacco products at an inflated level."  Id. at 171-72.  In holding that

the plaintiff alleged adequate facts to support a continuing course of conduct doctrine tolling

argument, the Izzarelli court stated:

> Here, Izzarelli alleges that for a period of more than forty years,
> Reynolds directed a marketing strategy to minors, manipulated the
> nicotine in cigarettes to cause minors to become addicted, and
> issued deliberately false denials about the health hazards and
> addictive nature of smoking. She alleges that this scheme continued
> into the 1990s, at which time individuals who began smoking as
> minors were addicted. In sum, her allegations of recent wrongful
> conduct is related to the prior wrongful conduct and is thus
> sufficient to bring the case within the continuing course of conduct
> doctrine.

Id. at 177.

Plaintiffs in this case allege and/or have proven through discovery, that for years

Defendant intentionally and deceptively manipulated the design of its Jeep Wrangler to look like

it has adequate rollover protection, when it does not, that induced Chris Phelan and other

consumers to purchase Jeep Wranglers at an inflated price.  (Dkt. #18, at ¶¶ 7-10, 18-23).

Plaintiffs also allege that since April 1979 through the present, Defendant directed a deceptive

marketing and litigation defense strategy to the consuming public, including Chris Phelan, to

22

intentionally conceal the fact that Defendant's Jeep Wranglers do not have adequate rollover safety protection, so that Defendant could continue charging inflated prices, and so that consumers would not seek to recover for the economic losses they suffered.  Id.

The Court's September Order states that, "When the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." (Dkt. #81, n.1)  However, Plaintiffs still maintain that the "wrong sued upon" continues beyond the vendor's receipt of payment, and that Chris Phelan had a reasonable period to revoke his acceptance if he had learned that the Jeep Wrangler was not rollover safe.  CGS § 42a-2-608 provides that "the buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him … within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects."

The Jeep Wrangler's lack of adequate rollover protection is a latent defect that Defendant knowingly, continually and deceptively concealed from Chris Phelan and other Jeep Wrangler owners and lessees through Defendant's deceptive marketing scheme and obstructionist litigation practices.  Defendant's concealment of the latent Jeep Wrangler roll cage system defect concealed from Chris Phelan that he had overpaid for his Jeep Wrangler, because it was not rollover safe. Had Chris Phelan known or discovered that his Jeep Wrangler lacked any adequate rollover

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

protection prior to his January 18, 2000 fatal Jeep Wrangler rollover accident, he would and could have revoked his acceptance, thus preventing his economic losses from Defendant's unlawful CUTPA conduct.

Plaintiffs' continuing course of conduct allegations and proof are legally sufficient to toll the CUTPA statue of limitations. Defendant had actual knowledge that the Jeep Wrangler lacked adequate rollover protection, and that consumers perceived the Jeep Wrangler's roll cage system appearance and design as "safe," as Defendant hoped they would. Therefore, Defendant's summary judgment motion must be denied because there are genuine issues of material fact regarding Plaintiffs' continuing course of conduct tolling argument.

## IV.    CONCLUSION

Plaintiffs oppose Defendant's summary judgment motion as to the First Count of Plaintiffs' Amended Complaint for the reasons, authorities, and proof herein, because the Phelan estate timely filed this CUTPA action, the statute of limitations has yet to expire, and therefore the Phelan estate has standing to represent the Connecticut class of Jeep Wrangler owners and lessees. Furthermore, Plaintiffs still have the opportunity to amend and revise their CUTPA allegations to conform them to Plaintiffs' proof obtained through discovery, after discovery in this case has been concluded.

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

Respectfully submitted,
PLAINTIFFS


BY _____
Steven E. Arnold, ct07966
sea@SAlaw.us
Peter Van Dyke, ct24747
pvd@SAlaw.us
James H. Halpin, Jr., ct25357
jhh@SAlaw.us
Stanger & Arnold, LLP
29 South Main Street
West Hartford, CT 06107
Tel. (860) 561-0650
Fax. (860) 561-0646
Their Attorneys

25

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was mailed on March 5, 2004, postage prepaid, to all counsel and pro se parties of record as follows:

Peter M. Durney, Esq.
Marie E. Chafe, Esq.
James P. Kerr, Esq.
Cornell & Gollub
75 Federal Street
Boston, MA 02110

Daniel Krisch, Esq.
Horton, Shields & Knox, P.C.
90 Gillett Street
Hartford, CT 06105

Lewis H. Goldfarb, Esq.
Hogan & Hartson
875 Third Avenue
New York, NY 10022

Courtesy copy to:

The Honorable Janet Bond Arterton
United States District Court
District of Connecticut
141 Church Street
New Haven, CT 06510

Terri S. Reiskin, Esq.
James A. Hourihan, Esq.
Hogan & Hartson
555 Thirteenth Street
Washington, DC 20004

M. Sheila Jeffrey, Esq.
Miller, Canfield, Paddock & Stone, P.L.C.
Seventh Floor
101 North Main
Ann Arbor, MI 48104

The Honorable Joan Glazer Margolis
United States District Court
District of Connecticut
141 Church Street
New Haven, CT 06510

_____
Peter M. Van Dyke

26