FILED

2004 JAN 12 P 4: 58

S. DISTRICT C---
NEW HAVEN, C---

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE JEEP WRANGLER CLASS ACTION | : | CIVIL NO. 3:02 CV 1219 (JBA) |
| | : | |
| ANGELA PHELAN, ADMINISTRATRIX OF | : | FEB 10 2004 |
| THE ESTATE OF CHRISTOPHER PHELAN, | : | |
| CLASS MEMBER, AND INDIVIDUALLY | : | CHAMBERS JOAN G. MARGOLIS |
| | : | U. S. MAGISTRATE JUDGE |
| Plaintiffs | : | NEW HAVEN, CONNECTICUT |
| | : | |
| VS. | : | |
| | : | |
| DAIMLERCHRYSLER CORPORATION | : | JANUARY 12, 2004 |
| | : | |
| Defendant | : | |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANT'S MOTION FOR PROTECTIVE ORDER
## REGARDING PLAINTIFFS' DEPOSITION DISCOVERY

Defendant's Motion For Protective Order regarding Plaintiffs' deposition discovery

should be denied for the following reasons and authorities.

I.   **PLAINTIFFS' DEPOSITION DISCOVERY COMPLIES
     WITH THE COURT'S RULES AND RULINGS**

On November 24, 2003, 5 weeks before the Court's December 31, 2003 product liability

discovery deadline, Plaintiffs served notices of Defendant's deposition by and through 13 of

Defendant's employees.  On December 4, 2003, 4 weeks before the discovery deadline, Plaintiffs

1

STANGER & ARNOLD, LLP
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

also served 9 additional notices of Defendant's deposition by and through its employees, and by Fed.R.Civ.P. 30(b)(6) designation. Plaintiffs' notices of Defendant's depositions were served well before, not "on the eve of," the discovery deadline, with adequate time to complete them, and with detailed information about the subject matter of each of Defendant's depositions. Plaintiffs also offered to take two and three depositions per day, and to make any reasonable accommodation due to the December Jewish and Christian holidays, including rescheduling depositions into January 2004. Exh. 1 (November 24, 2003 letter to James Kerr).

Plaintiffs respect and abide by the Court's July 10, 2003 denial of Plaintiffs' Motion To Compel Defendant's Jeep Wrangler (TJ) discovery, without prejudice to renew with additional evidence from an expert, as well as the Court's further October 21, 2003 Ruling thereon. Plaintiffs timely filed their Renewed Motion To Compel Defendant's Jeep Wrangler (TJ) discovery compliance with deposition testimony from one of Defendant's more senior Jeep Wrangler (TJ) design experts, and then further with an engineering report from one of Plaintiffs' automotive design consulting experts, to establish the substantially similar roll cage design, and alleged design defects, of the Jeep Wrangler (YJ) and (TJ). The Court has not yet ruled on Plaintiffs' Renewed Motion To Compel Defendant's Jeep Wrangler (TJ) discovery compliance. Nonetheless, to the extent that the scope of Plaintiffs' deposition notices included Defendant's Jeep Wrangler (TJ) roll cage design considerations, Plaintiffs merely continue to make a record of

2

the additional Jeep Wrangler (TJ) deposition discovery Plaintiffs also seek from Defendant.

Plaintiffs neither expected Defendant's Jeep Wrangler (TJ) deposition discovery cooperation, nor

attempted to press Defendant for any Jeep Wrangler (TJ) discovery that the Court had not yet

permitted, until the Court's ruling on Plaintiffs' Renewed Motion To Compel Defendant's Jeep

Wrangler (TJ) discovery compliance.

## II.  PLAINTIFFS' DEPOSITION DISCOVERY PRACTICES ARE NOT OPPRESSIVE AND MOSTLY INVOLVED DEFENDANT'S FORMER EMPLOYEES

Fed.R.Civ.P. 30(a)(2)(A) does not limit the number of deposition notices, only the number

of depositions a party may take without leave of the Court. Plaintiffs noticed 21 of Defendant's

employees by name, and also noticed Defendant's deposition by Rule 30(b)(6) designation. It

should be expected that some of Defendant's employees whose depositions Plaintiffs noticed

would also be knowledgeable about the subject matters of Defendant's Rule 30(b)(6) designee,

and that depositions of some of Defendant's more knowledgeable employees would make it

unnecessary to take every deposition noticed. However, in response to Plaintiffs' deposition

notices, Defendant only agreed to produce Mr. Leon Neal and Mr. Richard Friday, and Plaintiffs'

only other depositions to date have been of Defendant's experts. Thus, unless and until

Defendant agrees to produce other deponents, Rule 30(a)(2)(A) is inapplicable.

**STANGER & ARNOLD,** LLP

29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile 860.561.0646
Juris No. 419042

Furthermore, the subject matters and scope of Plaintiffs' Jeep Wrangler product defect claims against Defendant in this case make manifest the voluminous documents, data and information requested by Plaintiffs, as well as the many depositions that this case may require. This information is in Defendant's possession and control, and there is no excuse for Defendant's intentional and willful discovery non-compliance to date.

Defendant "object[ed] … to producing company witnesses to testify about the myriad of other issues addressed in the Rule 30(b)(6) deposition notice." However, Defendant's two Rule 30(b)(6) designees, Mr. Neal and Mr. Friday, would not, or could not, testify to matters for which they were designated, and Defendant refused to produce other designees. Defendant represented to Plaintiffs that Mr. Neal, to a greater extent, and Mr. Friday, to a lesser extent, would testify in such dual capacities and with superior knowledge about the subject matters of Plaintiffs' 30(b)(6) deposition notice. Defendant's Motion For Protective Order (D's Motion), at 3. Moreover, the morning of Mr. Friday's deposition, Defendant rescinded Mr. Friday's status as a corporate designee. On more than one occasion during his deposition, Mr. Neal professed that he had no knowledge of a question or subject matter, despite the fact that the question was rephrased with greater precision and persistence. Exh. 2, at 43-45 (Phelan Neal Deposition). Mr. Neal also professed to remember little about relevant discoverable information concerning the 10 or so other Jeep Wrangler accidents he has investigated, including those about which he has testified.

4

Id., at 140-42, 144. Mr. Neal's deposition made it evident that he has specialized witness training and experience from his involvement in Defendant's other Jeep Wrangler litigation to purposefully prevent, to the point of obstruction, the discovery of Defendant's other Jeep Wrangler discoverable information, even when questioned precisely and persistently. Id., at 50-52. To date, Defendant continues to refuse to produce for deposition any of Defendant's other employees whose depositions Plaintiffs had noticed, or any other of Defendant's designees who are truly knowledgeable about the subject matters identified in Plaintiffs' deposition notices, thereby causing Plaintiffs to incur additional time and expense to travel back to Michigan to complete the depositions of Defendant's employees and designees.

Furthermore, most of Plaintiffs' deposition notices were of persons with knowledge relevant to this case who are no longer employed by Defendant. Defendant has no basis to seek any protection from Plaintiffs' deposition notices of Defendant's former employees. No discovery deadline per se applies to Defendant's former employees, and Plaintiffs remain willing to reasonably accommodate Defendant's counsels' and the deponents' schedules to accomplish non-party discovery before trial. Consequently, none of the protections Defendant seeks with its Motion For Protective Order are sustainable.

5

### III.    PLAINTIFFS' INDEPENDENT DISCOVERY EFFORTS PROVE DEFENDANT'S INTENTIONAL AND WILLFUL DISCOVERY NON-COMPLIANCE

Defendant continues to refuse to provide Plaintiffs with Defendant's full compliance with Plaintiffs' written and deposition discovery regarding Defendant's inadequate and unsafe Jeep Wrangler roll cage design and practices, including the roll cage design evolution from Defendant's Jeep CJ, to its Jeep Wrangler (YJ), to Defendant's Jeep Wrangler (TJ).  From Plaintiffs' time-consuming and costly independent discovery of Defendant's defective Jeep Wrangler roll cage design and insubstantial design evolution to date, necessitated by Defendant's repeated discovery noncompliance, Plaintiffs offer the following further offer of proof of the relevance of Plaintiffs' discovery of Defendant's Jeep Wrangler (CJ), (YJ), and (TJ) roll cage design, practices and limited evolution.

### A.    Defendant's Improper Pattern Of Discovery Obstruction And Non-Compliance

Defendant's bad faith discovery practices have been well chronicled in this matter.[1]  On December 31, 2002, more than 1 year ago, Plaintiffs served Defendant with their First Set Of Product Liability Interrogatories And Requests For Production requesting broad categories of information for all Jeep Wrangler series model years, not just the 1994 Jeep Wrangler (YJ).

---

[1] Plaintiffs incorporate by reference their August 15, 2003 Motion For Extension Of Time To Complete Product Discovery.

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

Defendant's initial responses, or lack thereof, were the beginning of its calculated methodology to intentionally withhold discoverable information from Plaintiffs until ordered to do so by the Court, or unless Plaintiffs discovered this information through their own independent investigation.

Initially, Defendant provided responses only as to the 1994 Jeep Wrangler (YJ), but indicated that it would only produce documents subject to a protective order. Defendant then retained special discovery counsel in Michigan, who had not filed an appearance in this case, to negotiate the terms of the protective order. Once a protective order was finally agreed to and executed, Defendant produced limited documentation as to the Jeep Wrangler (YJ), and Plaintiffs were forced to file their May 19, 2003 Motion To Compel. Only then did Defendant agree to supplement its compliance with responses and document relating to all Jeep Wrangler (YJ) series model years. However, Defendant refused to produce discoverable information relating to the Jeep Wrangler (TJ), despite the fact that Defendant has voluntarily, or by Court order, produced similar Jeep Wrangler (TJ) information in lawsuits involving a Jeep Wrangler (YJ). Moreover, Defendant delayed months before providing Plaintiffs with its purported discovery compliance as to the Jeep Wrangler (YJ).[2]

---

[2] Defendant's discovery pattern of stonewalling Plaintiffs is reflected in the pleadings from both the <u>Waitt</u> and <u>Gillespie</u> matters. <u>Exh. 3</u>, at 2-3 (Memorandum in Support of Plaintiffs' Motion to Compel in <u>Gillespie</u>); <u>Exh. 4</u>, at 2 (DaimlerChrysler Corporation's Supplemental Responses to Plaintiff's Notice of Deposition dated August 9, 1999);

**STANGER & ARNOLD, LLP**
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

One of the documents Defendant finally produced was a list of other similar incidents and lawsuits involving Jeep Wrangler (YJ) series model vehicles, including <u>Waitt</u>, which Defendant identified as a Hartford, CT Superior Court case with no known docket number, or any time frame reference. Eventually Plaintiffs determined that <u>Waitt</u> involved a fatal 1993 Jeep Wrangler (YJ) rollover accident in Connecticut, and that Defendant's same counsel in this case were Defendant's counsel in the <u>Waitt</u> case, who certainly knew all about <u>Waitt</u>'s highly relevant subject matter.

After reviewing thousands of pages of pleadings and discovery materials in the <u>Waitt</u> case, the extent of Defendant's intentional and willful discovery non-compliance in this case came to further light. Based on their findings in <u>Waitt</u>, Plaintiffs spent weeks contacting court clerks across the country requesting contact information from other attorneys involved in these cases, conducting Westlaw and Lexis searches, and conducting countless internet searches. Plaintiffs' efforts were further impeded, and their time spent, because the list of litigation provided by Defendant contained docket numbers are Court locations that were incorrect, referenced cases that contained protective orders, and even a Chrysler Lebaron matter. Plaintiffs' eventually were able to obtain thousands of additional pages of pleadings, relevant discovery

---

Exh. 5, (Affidavit of Edward F. Hennessay dated November 30, 1998); Exh. 6, at 1-2 (Plaintiff Wendy Padula Memorandum in Support of Motion to Compel dated May 28, 1999).

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

responses, and deposition transcripts from other lawsuits involving Defendant's Jeep Wrangler (YJ) that demonstrats Defendant continues to intentionally withhold information and documents that Defendant is required to timely and fully disclose.

In Waitt, Defendant initially failed to include any reference to the programs that led to the development of the Jeep Wrangler in its initial discovery responses, and then objected to producing those documents once the plaintiff exposed their existence. Exh. 4, at 1-2. Defendant, however, knew its objections would fail because its employees have previously testified that the development programs led to the creation of the Jeep Wrangler (YJ). Exh. 7., at 11-12 (Gillespie Thorton Deposition). In addition, Defendant's pattern of intentionally withholding documents is also demonstrated in the McNulty matter. Exh. 8, at 152-59 (McNulty Thorton I Deposition). However, the greatest example of Defendant's past discovery abuses occurred in the Dize matter, where Defendant's Answer was ordered stricken by the Court and a default declared because of Defendant's bad faith discovery practices, including the intentional withholding of documents. Exh. 9 (Dize v. DaimlerChrysler Order dated December 3, 2001).

**STANGER & ARNOLD, LLP**
29 South Main Street • Suite 325 • West Hartford, CT 06107 • 860.561.0650 • Facsimile: 860.561.0646
Juris No. 419042

**B.     Defendant's Jeep Wrangler (CJ)-To-(YJ)-To-(TJ)
        Roll Cage Design History And Similarities**

> **1.     Jeep CJ to Jeep Wrangler (YJ) Design History and Similarities**

In the late 1970s, Defendant first attempted to improve the roll bar of the Jeep CJ5.  Exh. 8, at 124.  Claims had been made that the CJ5 roll bar was not good enough.  Id., at 171.  The goal in developing the CJ7 was to improve upon the amount of force required to crush the roll bar system from the CJ5.  Id., at 174-175.  Thereafter, the 1979 ½ roll bar was developed to help address complaints surrounding the perceived defect in the CJ's roll bar.  Id., at 199-200.

> Q:  Before 1985 what was your understanding, if any, of the allegations that were
>
> being made about roll bar failures in either CJ5's or CJ7 vehicles?
>
> A:  That there was too much crushing, that the roll bar did not provide enough
>
> protection.  Exh. 10, at 93 (McNulty Thorton II Deposition).

In the late 1970s into the early 1980s, Defendant evaluated the idea of replacing the CJ7 with a completely new vehicle.  Exh. 7, at 46-7 .  Defendant concluded a new vehicle would be too expensive and decided to save the CJ.  Id., at 48.  Thus the development of the YJ ensued, "[T]here certainly was consideration as to whether the new vehicle should have a fold-down windshield or not, and there were some people that saw no reason for a fold-down windshield and there were many that said no, the customers want it.  In surveys that had been done, it's one of the

10

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

things that they point to that say they want a new vehicle." Id., at 15. Consumers also wanted a safer vehicle. Exh. 11, at 64 (Rogers Thorton Deposition).

In response to lawsuits, Defendant added the side bars to prevent the windshield from entering into the occupant compartment. Exh. 7, at 107, 79-80. "Certainly in rollover accidents of some sort, if the [CJ] windshield hit the ground, it would deform since it was not a structural member. And it may go forward, sideways, or rearward. And one of the things that we were looking into was to provide a structure that would reduce its tendency to come into the occupant space, and that's what we did on the Wrangler." Id., at 107. The side bars were designed to prevent the windshield from entering into the occupant compartment and force it to crush to the side, not the rear. Exh. 8, at 218. The purpose of the structure forward of the main hoop of the roll bar through the windshield area was to make sure the windshield was less likely to be forced into the occupants' compartment. Exh. 10, at 114. "In the Wrangler, what was done was to greatly increase the force required to cause the windshield to be deformed and pushed back towards the people in the car. The structure, the way it is when it starts to yield and fail, it tends to push sideways." Exh. 7, at 85. Thus, Defendant was completely aware of the design defect present in this case:

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile: 860.561.0646
Juris No. 419042

Q: "And, as an engineer at Chrysler, do you understand that in the event of an

accident, including a rollover, an occupant's head may impact with portions of the

roof rail? Side Bar?

A: That's a possibility, yes." Exh. 12, at 83 (Rogers Neal Deposition).

Meanwhile stronger YJ designs were passed upon, "We also in advanced engineering

looked at a lot of different concepts of providing structure forward of the roll bar." Exh. 7, at 14.

"There were many other designs that were considered. The reason I answer that way – you say

rejected – wasn't so much of a rejection but let's look at this, then later let's look at this idea,

then, later, let's look at this idea and finally, when we got to the Wrangler, as it was – we were

looking at it and designing and developing it, finally people said, yes, let's do this. The others

just didn't develop enough interest to go anywhere." Exh. 10, at 113. The T-Bar design provided

more strength forward of the roll bar than a side bar model. Exh. 7, at 23-25. The T-Bar design

was not selected because the Defendant believed consumers would react negatively to its

enclosures. Id., at 27-28. The T-Bar design is a roll cage. Id., at 86. "[T]he full roll cage would

probably cost more, but so much in manufacturing depends upon exactly how you toll it, but I

think it would probably be more expensive." Id., at 90.

The side movement created by Defendant is exactly what forced the doorframe to come

into contact with Christopher Phelan's head in this case. See Ojalvo and Hayes Reports. In fact,

STANGER & ARNOLD, LLP
29 South Main Street · Suite 325 · West Hartford, CT 06107 · 860.561.0650 · Facsimile 860.561.0646
Juris No. 419042

this very side movement of the door frame is clearly depicted in Defendant's own testing.  Exh. 13, at 10.  Defendant only sought to correct part of the CJ problem, i.e., windshield movement to the rear, while exacerbating the side movement problem, which it only addressed using a minor windshield reinforcement, "The windshield was considerably less stiff and strong – the windshield was less strong than the roll bar."  Exh. 7, at 32.

2.    **Jeep Wrangler (YJ) to Jeep Wrangler (TJ) Design History and Similarities**

Both the deposition testimony of Defendant's Jeep Wrangler (TJ) release engineer, Peter Chapman, and James D. Mundo's Engineering Report, make it clear that there are only minor differences between the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) roll cage systems, and that the Jeep Wrangler (TJ) roll cage system, including the A-Pillar and sport bar, share the same design defect issues pertinent to those in this case.[3]  Furthermore, the design process to revise and improve the Jeep Wrangler (YJ) into the Jeep Wrangler (TJ) model began in 1993, a year prior to the manufacture of Chris Phelan's Jeep Wrangler (YJ).  Exh. 13, at 7 (Gillespie Chapman Deposition).

Mr. Chapman worked on the Jeep Wrangler (TJ) roll cage system design, including its windshield and sport bar, and he testified on behalf of Defendant in a separate action involving a

---

[3] Plaintiffs incorporate by reference their May 19, 2003 Motion To Compel with supporting memorandum of law, and their November 14, 2003 Renewed Motion To Compel with supporting memorandum and James D. Mundo's Engineering Report.

13

Jeep Wrangler (YJ) accident. Id.  In addition to testifying that there are only minor differences between the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) roll cage systems, and that the Jeep Wrangler (TJ) roll cage system, including the A-Pillar and sport bar, share the same design defect issues pertinent to those in this case[4], Mr. Chapman also testified that Defendant used "the '95 [Jeep Wrangler (YJ)] … as a benchmark to do the '97 [Jeep Wrangler (TJ)]," and that Defendant made use of all of the Jeep Wrangler (YJ) design and release drawing work, as well as input from Defendant's Jeep Wrangler structures group for Defendant's Jeep Wrangler (TJ) design. Id. at 26-27.  In addition, the Jeep Wrangler (TJ) prototype has a "Functional Roll Cage" that shares a design similar to the concept Jeep Wrangler (YJ) vehicles that were developed in the early 1980s. Exh. 14.  Likewise, Jeep has an "Ultimate Rescue" (TJ) concept vehicle that is similar to one of the early 1980s Jeep Wrangler (YJ) alternate designs they tested, which had a stronger roof structure. Id.  Thus, strength tests on the new Jeep Wrangler (TJ) are relevant to the Jeep

---

[4]
Q.    Do you know how the TJ model differs from the YJ model?
A.    In design, yes.
Q.    In particular with regard to the sport bar does the TJ model differ from the YJ model?
A.    Yes, some minor changes.
Q.    What are those changes?
A.    The main hoop of the sport bar was formerly a two-piece, became a three-piece.  The styling attachment of the side bar was modified, and an additional attachment was made into the B-pillar.
Q.    What about the windshield, did it change from the YJ to the TJ?
A.    Only inasmuch as it was a new windshield.  The basic design concept stayed the same.
Q.    Was the A-pillar changed in any way in the TJ versus the YJ?
A.    Again, only inasmuch as it was a new windshield, so the basic panels were redesigned but in the same format. Exh. 13, at 10.

14

**STANGER & ARNOLD, LLP**
29 South Main Street  ·  Suite 325 ·  West Hartford, CT 06107  ·  860.561.0650  ·  Facsimile: 860.561.0646
Juris No. 419042

Wrangler (YJ) concept vehicle.

Plaintiffs noticed the deposition of Adrian Van Campenhout, a structures engineer who was involved in the development of the Jeep Wrangler (TJ).  His testimony is relevant to this case because he has knowledge of the development of the Jeep Wrangler (TJ) from May 1994, when the Jeep Wrangler (YJ) was still in production, as well as the continued inadequacies of the Jeep Wrangler (TJ), through January 2000 when Chris Phelan was killed.  <u>D's Motion</u>, at 7.  His testimony is also relevant to Defendant's post-sale duty to warn customers, as well as the general public, of the defective and unreasonably dangerous Jeep Wrangler (YJ) and (TJ) roll cages that could result in serious injury to Jeep Wrangler occupants.

Defendant's entire objection to providing Plaintiffs with the requested Jeep Wrangler (TJ) testimony and information is based on the Affidavit of Mr. Neal.  However, Mr. Neal's Affidavit is not credible because he testified that he learned all that he knows about the Jeep Wrangler (TJ) from Mr. Chapman who, as discussed above, testified that that there are only minor differences between the Jeep Wrangler (YJ) and the Jeep Wrangler (TJ) roll cage systems, and that the Jeep Wrangler (TJ) roll cage system, including the A-Pillar and sport bar, share the same design defect issues pertinent to those in this case.

15

## IV.  MERCEDES-BENZ STANDARDS AND TESTING ARE RELEVANT AND IN DEFENDANT'S CONTROL[5]

Testimony and information regarding Mercedes-Benz standards and testing is both relevant to product defects alleged in this case, as well as in Defendant's control.  Plaintiffs are seeking information on vehicle rollover accidents, testing, and maneuvers in order to determine industry standards, and therefore Defendant's standard of care relating to the Jeep Wrangler's roof resistance to crushing and collapsing in the event of a rollover.  Upon information and belief, Plaintiffs are aware that DaimlerBenz conducted vehicle rollover testing on its Mercedes vehicles prior to and up to the time of Chris Phelan's accident.

The documents requested by Plaintiffs are, in fact, relevant to their product claims against Defendant, and they are reasonably calculated to lead to the discovery of admissible evidence.  If there existed at the time of this accident a recognized and accepted test or measurement of a vehicle's resistance to rollover during ordinary driving maneuvers which allows a comparison of vehicles, either among themselves or to an accepted standard, and Defendant either was aware or should have been aware of such a test, then the existence and particular details of any such test or

---

[5] On November 27, 2000, Defendant was ordered to produce information and witnesses relating to Mercedes-Benz rollover testing and standards by the <u>Gillespie</u> court.  <u>Exh. 15</u> (<u>Gillespie</u> Plaintiffs' Motion To Compel); <u>Exh. 16</u> (<u>Gillespie</u> Order Regarding Motion To Compel).  Plaintiffs hereby incorporate by reference the reasons and authorities set forth in these Exh. 15 and Exh. 16 as their own.

16

measurement, along with Defendant's disregard or failure to avail itself of that information, go directly to the heart of Plaintiffs' claims.

## V.    DEFENDANT KNEW THAT FMVSS 216 WAS AN INADEQUATE TEST OF ROOF CRUSH STRENGTH

Testimony and information regarding all of Defendant's FMVSS 216 activities is also relevant, or reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs allege that the Jeep Wrangler roll cage is unreasonably dangerous and defective because it is unable to protect occupants in the event of a foreseeable rollover. Defendant's experts largely base their opinions that the Jeep Wrangler roll cage is not defective on the fact that it meets the FMVSS 216 roof crush test. However, upon information and belief, Plaintiffs are aware that Defendant is in possession of documents indicating that FMVSS 216 was an inadequate test to determine roof crush strength in its vehicles, specifically in the possession of the Chrysler minivan safety leadership team, and Plaintiffs are entitled to review such documents, and to depose Defendant's designee most knowledgeable on this subject.

Plaintiffs offer the following further offer of proof of the relevance of Plaintiffs' discovery of Defendant's other FMVSS 216 activities:

As early as the 1960's, the safety group conducted a series of tests, No. 1109, on the CJ roll bar in anticipation of a government services administration requirement, 5-15/25, that vehicles it would purchase must pass a certain measure of distance from a particular point on the

17

seat to whatever structure ended up above the seat after a rollover. Exh. 8, at 78, 137; Exh. 10, at 31. Mr. Thorton has reviewed documents and videos relating to the 1109 tests. Exh. 8, at 142. If Mr. Thornton wanted to review 1109 materials he would request them from the legal department. Id., at 145.

In 1969, R.F. Penrod, then a Special Equipment Engineer, rolled a CJ down a rock quarry. Id., at 135. Mr. Penrod recommended changes to the roll bar. Id., at 136. The Jeep CJ was also subject to a dynamic roll bar test, No. 3246, conducted by the safety group conducted at General Motors Proving Grounds where it was rolled at a speed of 30 miles per hour using FMVSS 208 as a guideline. Exh. 8, at 64, 70, 126. The Jeep was placed on a dolly that travels down a track where it impacts a stop causing the vehicle to be thrown into the air and start rolling. Id., at 90. Test No. 3246 demonstrated deformation into the occupant compartment. Id., at 94. Defendant chose not to conduct this test again and turned to FMVSS 216. Id., at 108, 110. "And we concluded that the test would not be a repeatable test because the vehicle rolled and pitched and bounced, and we did not feel that if you ran two vehicles, one right after another, that they would act the same. So it wasn't a way of us determining whether we made a better roll bar or not." Exh. 7, at 38.

When Defendant began 216 testing it ignored the windshield and only tested the CJ roll bar. Exh. 11, at 18-19. "Well, if you took a standard Wrangler, with a fiberglass top, and ran a

.18



216 test on it, then the vehicle would pass the 216 test without pushing on the roll bar. The problem with trying to do that is, as soon as you push very far, you get into the roll bar, and the roll bar is extremely strong. So the loads would go up fast but the front portion there, the A pillar area, where you strike first, if you tested the Wrangler it would pass." Exh. 10, at 62. "If you compare the strength and stiffness of the roll bar to the windshield frame and the top structure, the roll bar is much much stronger and stiffer." Id., at 63. "That the running of the 216 test on the Wrangler takes a much higher force than the five inches of test is the standard that is required for passenger cars." Id., at 144.

If, at the time of this accident, Defendant knew that FMVSS 216 was an inadequate test of roof crush strength, then the existence and particular details of any such knowledge, tests or documents are directly relevant to Plaintiffs' product defect claims in this case.

## VI.    DEFENDANT'S DOCUMENT RETENTION POLICY IS DISCOVERABLE

Testimony and information regarding Defendant's document retention policy, and whether or not Defendant has complied with such a policy, clearly is discoverable. Defendant has admitted that it engaged in the voluntary destruction of documents that may be relevant to this case. Exh. 17. Plaintiff's, as well as the jury, are entitled to know if Defendant has destroyed any other documents relevant to this case.

19

## VII.    CONCLUSION

For the foregoing reasons and authorities Plaintiffs oppose Defendant' Motion For Protective Order, and Plaintiffs submit that instead, the Court should impose sanctions against Defendant for its continued bad faith motion and discovery practices in this case.

Respectfully submitted,
PLAINTIFFS

BY

Steven E. Arnold, ct07966
sea@SAlaw.us
Peter Van Dyke, ct24747
pvd@SAlaw.us
James H. Halpin, Jr., ct25357
jhh@SAlaw.us
Stanger & Arnold, LLP
29 South Main Street
West Hartford, CT 06107
Tel. (860) 561-0650
Fax. (860) 561-0646
Their Attorneys

20

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was sent, postage prepaid, on January 12, 2004 to:

Peter M. Durney, Esq.
Marie E. Chafe, Esq.
James P. Kerr, Esq.
Cornell & Gollub
75 Federal Street
Boston, MA 02110

Daniel Krisch, Esq.
Horton, Shields & Knox
90 Gillett Street
Hartford, CT 06105

Lewis H. Goldfarb, Esq.
Hogan & Hartson
875 Third Avenue
New York, NY 10022

Terri S. Reiskin, Esq.
James A. Hourihan, Esq.
Hogan & Hartson
555 Thirteenth Street
Washington, DC 20004

M. Sheila Jeffrey, Esq.
Miller, Canfield, Paddock & Stone, P.L.C.
840 West Long Lake Road, Suite 200
Troy, MI 48098

The Honorable Joan Glazer Margolis
United States District Court
District of Connecticut
141 Church Street
New Haven, CT 06510


Steven E. Arnold

21