**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **PHELAN** | : | |
| **v.** | : | **NO. 3:02cv1219 (JBA)** |
| **DAIMLERCHRYSLER** | : | |

**RULING ON DEFENDANT'S MOTION TO EXCLUDE AND MOTION FOR SUMMARY JUDGMENT [DOC. #77-1, #77-2]**

Defendant's Motion to Exclude Computer simulations and corresponding testimony by Drs. Irving Ojalvo and Wilson Hayes, purportedly brought under the admissibility principles of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), is based, in part, on its view that Dr. Ojalvo's modeling simulation of the decedent Christopher Phelan's Jeep rollover using the Articulated Total Body ("ATB") computer software programs is "junk science" that cannot assist the jury's fact finding task and will only mislead and confuse it, and that Dr. Ojalvo lacks the requisite qualifications to testify on injury causation. Defendant also seeks to exclude Dr. Hayes' testimony simulating Phelan's body movement during rollover using the Graphical Articulated Total Body ("GATB") software as "exclusively" based on Dr. Ojalvo's flawed data input. Finally, defendant moves to preclude the testimony of Dr. Malka Shah, the Associate State Medical Examiner who performed the Phelan autopsy to determine cause of death, on the grounds of lack of qualifications.

Assuming the preclusion of these experts' testimony, defendant then moves for summary judgment on the individual product liability claim in Count III of the Amended Complaint on the grounds that plaintiff, lacking any other competent testimony or the subject of how the accident occurred, Phelan's body movements during the accident and the mechanism of Phelan's resulting fatal injury, cannot meet her liability burden of proving vehicle defect attributable to defendant.

After full review of the parties' voluminous submissions it is apparent that defendant's motion is primarily an eclectic extraction of deposition statements taken out of context and dressed up as supposedly fatal concessions. Because plaintiff has adequately demonstrated that the testimony of all three experts "rests on a reliable foundation and is relevant to the tasks at hand" Daubert 509 U.S. at 597, Defendant's Motions must be denied in its entirety.

Defendant critiques Dr. Ojalvo, offered as an expert in mechanical engineering and biomechanics, who is a licensed professional engineer, Professor of Mechanical Engineering, and has considerable experience in vehicle accident reconstruction, because he "manipulated" the data and "patently misused" the ATB software simulation, and excluded essential data which did not support his opinion. On the contrary, Dr. Ojalvo's affidavit and deposition explains that an engineering analysis such as his accident reconstruction is necessarily a selection process to

ascertain what elements are critical and which are not. By his testimony, the "reconstruction" process here is one of adjusting estimated data calculations and assumptions obtained from application of conservation of momentum and energy principles, as well as testing roll cage crush properties, to obtain a model which correlated with the known facts of the accident, the physical evidence, site observations of locations of impact, distance path and final resting point, and the vehicle damage and condition. This retrospective process of selecting which critical information to use and which should be eliminated is where engineering expertise is brought to bear in making reasonable assumptions. At trial, defendant may cross-examine on whether Dr. Ojalvo excluded "essential known factors" about how the accident occurred or whether the facts excluded were, as Dr. Ojalvo claims, not relevant to the analysis. For now, however, Dr. Ojalvo's facts generally "fit" those of the case.

Defendant also disputes the validity and reliability of Dr. Ojalvo's use of the ATB computer program model for accident reconstruction. This computer simulation program was developed under the auspices of the National Highway Traffic Safety Administration ("NHTSA") and the Motor Vehicle Manufacturers Association ("MVMA") in the 1970's. The predictive accuracy of this ATB model has been validated to simulate gross vehicle motion and occupancy body motion in vehicle rollovers and is a recognized tool for accident study. The NHTSA reports (Pl.'s

Exh. 13, 14) show that used this program for this purpose was the object of the NHTSA study -- to develop a methodology using ATB to accurately predict the crash rollover motion of a vehicle given the set of vehicle conditions at rollover initiation and a prescription of the forces exerted on the vehicle by the crash environment. "With the methodology developed, accident investigators could use the process on a trial and error basis to reconstruct rollover crashes." (Pl. Exh. 14, p.6.) Hence, the significance of defendant's challenges to Dr. Ojalvo's real accident reconstruction and modeling, methodology, information selection process, absence of explanations for certain phenomena (e.g., 8 m.p.h. deceleration, rollover trigger, angle of guard rail impact) must be left for jury determination. Dr. Ojalvo's affidavit, rather than contradicting his deposition testimony, explains why his simulations were done as they were, why rear end vehicle geometry changes and guard rail cable impact were not relevant to his analysis and why certain types of gaps in information do not affect the modeling of the vehicle's and occupant's movements, and it will be up to the jury to accept or reject these explanations as it weighs witness credibility. Defendant's reliance on the fact that Dr. Ojalvo ran no crash tests "to be totally confident" does not require exclusion both because "total confidence" is not the Daubert standard. The purpose of NHTSA's project was to determine the feasibility of using the ATB model for predictive simulation, including rollover

dynamics, to develop the methodology to perform these simulations, and to validate the process using the results of actual crash tests. (Pl. Exh. 14, p. 62.) Its full scale testing provided baseline data to validates computer simulations and it found "[t]he success of these simulations demonstrates the feasibility of using the ATB program to predict the motion of a vehicle during a complex event such as a rollover." Id.

While the suitability of ATB simulations for reconstruction of actual motor vehicle rollover accidents is apparently the subject of professional debate, use of the ATB model to provide a reasonable prediction of a vehicle's motion during a rollover accident has general acceptance and its limitations do not make its use by Dr. Ojalvo "junk science." Thus, the ATB program and Dr. Ojalvo's use of it appear to meet Daubert requirements of testing, peer review and publication, error rates and standards for use and widespread acceptance in the automobile safety design and accident reconstruction community.

Dr. Ojalvo's opinion on causation of injury is based on his replication of the position of Phelan's head in relation to the bent driver's side door frame, his comparison to corroborative police photos and his personal observation of the door frame's blood covered "thin-edge metal surface" at the impact location. Medical education and training is not required to correlate the occupant movement simulation with observational conclusions for an opinion of where Phelan's head hit and a physical description

of that object; biomechanical expertise includes accident reconstruction and injury causation and Dr. Ojalvo has lectured and testified on these subjects for twenty years.

Next, the heart of defendant's attack on Dr. Hayes, professor of exercise and sport science, mechanical engineering and orthopedics and rehabilitation, is not his qualifications nor the GATB program he used, but that he engaged in "wholesale adoption" of Dr. Ojalvo's ATB analysis, and reliance on police photographs not actual vehicle inspection, such that the claimed unreliability of Ojalvo's data is said to irreparably taint Dr. Hayes' analysis. Dr. Hayes affidavit disputes defendant's characterization of his work, claiming that the GATB simulation he used as the basis for his opinions was independent of Dr. Ojalvo's occupant dynamics simulation and that he comparatively reviewed all Dr. Ojalvo's report and input files with official accident scene and medical reports, photographs, vehicle schematics and measurements and witness statements to verify accuracy. The GATB software, used to compute occupant kinematics, joint angles and torques, and contact forces between occupant and contact panels attached to the vehicle interior, utilizes Dr. Ojalvo's simulation data and as discussed above, it will be up to the jury to determine the weight and credibility to be given to Dr. Ojalvo's work. Given the interdependence between GATB and ATB, since the Court has found Dr. Ojalvo's proposed testimony to survive <u>Daubert</u> scrutiny, so does Dr. Hayes'.

Dr. Shah is claimed to lack qualifications and factual basis for her testimony that Phelan's head injury was likely caused by an upper portion of the driver door frame that crushed inward during the rollover. Defendant claims her disqualification because she lacks any background in the biomechanics of automotive accidents. Dr. Shah testified she has performed many autopsies involving deaths from massive head injuries in motor vehicle accidents, including rollovers. Her opinion that the probable mechanism of Phelan's death is a blow to the head by a "straight, blunt object" is based on her autopsy results. Her opinion that this "straight, blunt object" was probably the door frame adjacent to Phelan's head's location is based on her inspection of photographs of Phelan's body in the Jeep after the rollover, the angled shape of the door frame and her personal observations of the long curved head laceration and the way the scalp bone and skin were pulled down and the brain material pulled out. Her deposition testimony makes clear that she is not opining about whether the door frame became curved in the process of the accident, only that because it is curved, and is consistent with the object that caused the fatal head injury. Thus, no automotive biomechanics expertise is implicated in her testimony. Given her twenty-two years experience performing more than 5000 autopsies, her opinion based on personal observations during Phelan's autopsy and review of State Police photographs, is hardly "uninformed speculation" and her testimony will be

permitted.

For the forgoing reasons, the Court concludes that the gate-keeping function of excluding unreliable and irrelevant expert testimony is inapplicable to these three experts. Accordingly, Defendant's Motions are DENIED.

IT IS SO ORDERED.

______________________________

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut: August ___, 2004**